DE VEAU v. BRAISTED.

No. 71.  Argued March 1, 1960.—Decided June 6, 1960.

*Thomas W. Gleason* argued the cause for appellant. With him on the brief was *Julius Miller.*

*Thomas R. Sullivan* argued the cause and filed a brief for appellee.

*Nanette Dembitz* filed a brief for the New York Civil Liberties Union, as *amicus curiae,* urging reversal.

*William P. Sirignano, Irving Malchman* and *Jerome J. Klied* filed a brief for the Waterfront Commission of New York Harbor, as *amicus curiae,* urging affirmance.

Opinion of MR. JUSTICE FRANKFURTER, in which MR. JUSTICE CLARK, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, and judgment of the Court, announced by MR. JUSTICE BRENNAN.

This is an action brought in the Supreme Court of Richmond County, New York, for a declaratory judgment regarding the constitutional validity of § 8 of the New York Waterfront Commission Act of 1953 (N. Y. Laws

1953, cc. 882, 883; McK. Unconsol. Laws, § 6700aa *et seq.*), and for an injunction restraining its operation. The section is claimed to be in conflict with the Supremacy Clause of the United States Constitution; it is also challenged under the Due Process Clause of the Fourteenth Amendment, and as an *ex post facto* law and bill of attainder forbidden by Art. I, § 10, of the Constitution.

The Waterfront Commission Act formulates a detailed scheme for governmental supervision of employment on the waterfront in the Port of New York. The relevant part of the specific provision, § 8, under attack follows:

> "No person shall solicit, collect or receive any dues, assessments, levies, fines or contributions within the state from employees registered or licensed pursuant to the provisions of this act [pier superintendents, hiring agents, longshoremen and port watchmen] for or on behalf of any labor organization representing any such employees, if any officer or agent of such organization has been convicted by a court of the United States, or any state or territory thereof, of a felony unless he has been subsequently pardoned therefor by the governor or other appropriate authority of the state or jurisdiction in which such conviction was had or has received a certificate of good conduct from the board of parole pursuant to the provisions of the executive law to remove the disability."

The complaint upon which this action is based makes the following allegations. Appellant was a member, and beginning in 1950 had been Secretary-Treasurer, of Local 1346, International Longshoremen's Association, a labor organization with offices in Richmond County, New York, representing "employees registered or licensed pursuant to" the Waterfront Commission Act. As Secretary-Treasurer appellant had control of the Local's funds and also served as a bargaining representative. In 1920 appellant

had pleaded guilty to a charge of grand larceny in New York and had received a suspended sentence. It is not alleged that appellant has ever applied for or received a pardon or a "certificate of good conduct." Three years after the enactment of the Waterfront Commission Act, in 1956, the President of the International Longshoremen's Association was informed by the appellee, who was and is the District Attorney of Richmond County, New York, that because of appellant's conviction § 8 of the Act prohibited any person from collecting dues on behalf of Local 1346, so long as appellant remained its officer or agent. Appellee threatened to prosecute anyone collecting dues for the Local while appellant remained its officer. By reason of § 8 and this threat appellant was suspended as an officer of Local 1346, whereupon he brought this action.

The appellee moved to dismiss the complaint, and for judgment on the pleadings in his favor. This motion was granted. The court, holding that appellant's 1920 conviction was a conviction for a felony within the meaning of § 8, sustained the validity of that section. 11 Misc. 2d 661, 166 N. Y. S. 2d 751. This judgment was affirmed by the Appellate Division of the Supreme Court, 5 A. D. 2d 603, 174 N. Y. S. 2d 596, and by the Court of Appeals of New York, 5 N. Y. 2d 236, 157 N. E. 2d 165. See also *Hazelton* v. *Murray*, 21 N. J. 115, 121 A. 2d 1. Since a statute of a State has been upheld by the highest court of the State against a federal constitutional attack, the case is properly here on appeal. 361 U. S. 806.[1]

---

[1] Appellee's claim that the cause is moot, since, after the commencement of this action, Local 1346 was disbanded and all employees under its jurisdiction came under the jurisdiction of a new local, Local 1, with offices in New York County, must fail. On the basis of what has been submitted to us, the new local is, in part, simply the old in a new dress.

Due consideration of the constitutional claims that are made requires that § 8 be placed in the context of the structure and history of the legislation of which it is a part. The New York Waterfront Commission Act was an endeavor by New York and New Jersey to cope with long-standing evils on their joint waterfront in the Port of New York. The solution which was evolved between the two States embodies not only legislation by each but also joint action by way of a constitutional compact between them, approved by Congress, including the establishment of a bi-state Waterfront Commission.

For years the New York waterfront presented a notoriously serious situation. Urgent need for drastic reform was generally recognized. Thoroughgoing investigations of the mounting abuses were begun in 1951 by the New York State Crime Commission and the Law Enforcement Council of New Jersey. After extensive hearings, the New York Crime Commission in May 1953 published a detailed report (4th Report of the New York State Crime Commission, New York State Leg. Doc. No. 70 (1953)) on the evils its investigation disclosed and the legislative remedies these were thought to require. The Commission reported that the skulduggeries on the waterfront were largely due to the domination over waterfront employment gained by the International Longshoremen's Association, as then conducted. Its employment practices easily led to corruption, and many of its officials participated in dishonesties. The presence on the waterfront of convicted felons in many influential positions was an important causative factor in this appalling situation. It was thus described to Congress in the compact submitted by New York and New Jersey for its consent:

". . . the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting

148

from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment and a loss of respect for the law; that not only does there result a destruction of the dignity of an important segment of American labor, but a direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the Port of New York district.

". . . many of the evils above described result not only from the causes above described but from the practices of public loaders at piers and other waterfront terminals; that such public loaders serve no valid economic purpose and operate as parasites exacting a high and unwarranted toll on the flow of commerce in and through the Port of New York district, and have used force and engaged in discriminatory and coercive practices including extortion against persons not desiring to employ them; . . .

". . . stevedores have engaged in corrupt practices to induce their hire by carriers of freight by water and to induce officers and representatives of labor organizations to betray their trust to the members of such labor organizations." 67 Stat. 541–542.

Shortly after the Crime Commission submitted its report, the Governor of New York conducted hearings based upon the Crime Commission report. As a result, a Waterfront Commission Act was introduced into and passed by the Legislatures of both States in June 1953. N. Y. Laws 1953, cc. 882, 883; N. J. Laws 1953, cc. 202, 203.

Part I of both Acts constitutes what became the compact between the two States. This is the heart of the legislation. It establishes as a bi-state agency a Waterfront Commission of New York Harbor with power to license, register and regulate the waterfront employment of pier superintendents, hiring agents, longshoremen and port watchmen, and to license and regulate stevedores. It entirely prohibits one class of waterfront employment, public loading, found to be unnecessary and particularly infested with corruption. Manifestly, one of the main aims of the compact is to keep criminals away from the waterfront. The issue of licenses to engage in waterfront occupations, or the right to be registered, depends upon findings by the Commission of good character. In particular, past convictions for certain felonies constitute specific disabilities for each occupation, with discretion in the Commission to lift the disability, except in the case of port watchmen, where it constitutes an absolute bar to waterfront employment. A new procedure for the employment of longshoremen is also provided under the supervision of the Commission, replacing the archaic, corrupt "shape-up."

Under the requirement of Art. I, § 10, of the Constitution the compact was submitted to the Congress for its consent, and it was approved. This was no perfunctory consent. Congress had independently investigated the evils that gave rise to the Waterfront Commission Acts, and the Subcommittee of the Senate Committee on Inter-

state and Foreign Commerce had in a Report endorsed the state legislative solution embodied in these Acts. See S. Rep. No. 653, 83d Cong., 1st Sess., pp. 49–50. After the compact's submission to Congress, hearings were held upon it by the Committee on the Judiciary of the House of Representatives, at which arguments were made by interested parties for and against the compact. Approval was recommended by both the House Judiciary Committee and the Senate Committee on Interstate and Foreign Commerce. The House Committee concluded that "[t]he extensive evidence of crime, corruption, and racketeering on the waterfront of the port of New York, as disclosed by the State investigations reported to this committee at its hearings and by the recent report of the Senate Committee on Interstate and Foreign Commerce [S. Rep. No. 653, *supra*], has made it clear beyond all question that the plan proposed by the States of New York and New Jersey to eradicate those public evils is urgently needed." H. R. Rep. No. 998, 83d Cong., 1st Sess., p. 1. The Senate Committee Report stated its conclusion in similar terms. S. Rep. No. 583, 83d Cong., 1st Sess., p. 1. The compact was approved by Congress in August 1953. Act of Aug. 12, 1953, 67 Stat. 541, c. 407.

In addition to the compact, New York enacted, as Parts II and III of its 1953 Waterfront Commission Act, supplementary legislation dealing, in most part, with the administration of New York's responsibility under the compact. This supplementary legislation also contains two substantive provisions in furtherance of the objectives of the compact, but not calling for bi-state enforcement, and thus not included in the compact. These are § 8, which is here challenged, and a prohibition against loitering on the waterfront. New Jersey enacted a supplementary provision essentially similar to § 8. N. J. Laws, 1953, c. 202, § 8. Although § 8 does not require enforcement by the bi-state Waterfront Commission, and was

therefore not formally submitted as part of the compact to Congress, in giving its approval to the compact Congress explicitly gave its authority to such supplementary legislation in accord with the objectives of the compact by providing in the clause granting consent "[t]hat the consent of Congress is hereby given to the compact set forth . . . and to the carrying out and effectuation of said compact, and enactments in furtherance thereof."

In giving this authorization Congress was fully mindful of the specific provisions of § 8. Not only had § 8 already been enacted by the States as part of the Waterfront Commission Acts when the compact was submitted to Congress, but, in the hearings held before the House Committee on the Judiciary, it was specifically urged by counsel for the International Longshoremen's Association, as a ground of opposition to congressional consent, that approval of the compact by Congress would carry with it sanction of § 8. See Hearing before Subcommittee No. 3 of the Committee on the Judiciary, House of Representatives, 83d Cong., 1st Sess., on H. R. 6286, H. R. 6321, H. R. 6343, and S. 2383, p. 136. The ground of objection to the section which is appellant's primary reliance here, namely, that it conflicts with existing federal labor policy, was urged as ground for rejecting the compact. It is in light of this legislative history that the compact was approved, and that congressional consent was given to "enactments in furtherance thereof."

With this background in mind, we come to consider appellant's objection that § 8 is in conflict with and therefore pre-empted by the National Labor Relations Act, specifically §§ 1 and 7 of that Act, 29 U. S. C. §§ 151, 157. The argument takes this course. Section 1 of the National Labor Relations Act declares a congressional purpose to protect "the exercise by workers of full freedom of association, self-organization, and designation of rep-

resentatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." Section 7 grants employees "the right . . . to bargain collectively through representatives of their own choosing." Under § 8 of the Waterfront Commission Act, waterfront employees do not have complete freedom of choice in the selection of their representatives, for if they choose a convicted felon the union is disabled from collecting dues. Thus, it is said, with reliance on *Hill* v. *Florida,* 325 U. S. 538, there is a conflict and the state legislation must fall.

This is not a situation where the operation of a state statute so obviously contradicts a federal enactment that it would preclude both from functioning together or, at least, would impede the effectiveness of the federal measure. Section 8 of the Waterfront Commission Act does not operate to deprive waterfront employees of opportunity to choose bargaining representatives. It does disable them from choosing as their representatives ex-felons who have neither been pardoned nor received "good conduct" certificates. The fact that there is some restriction due to the operation of state law does not settle the issue of pre-emption. The doctrine of pre-emption does not present a problem in physics but one of adjustment because of the interdependence of federal and state interests and of the interaction of federal and state powers. Obviously, the National Labor Relations Act does not exclude every state policy that may in fact restrict the complete freedom of a group of employees to designate "representatives of their own choosing." For example, by reason of the National Labor Relations Act a State surely is not forbidden to convict and imprison a defendant in a criminal case merely because he is a union official and therefore could not serve as a bargaining representative.

It would misconceive the constitutional doctrine of pre-emption—of the exclusion because of federal regulation of what otherwise is conceded state power—to decide this case mechanically on an absolute concept of free choice of representatives on the part of employees, heedless of the light that Congress has shed for our guidance. The relevant question is whether we may fairly infer a congressional purpose incompatible with the very narrow and historically explained restrictions upon the choice of a bargaining representative embodied in § 8 of the New York Waterfront Commission Act. Would Congress, with a lively regard for its own federal labor policy, find in this state enactment a true, real frustration, however dialectically plausible, of that policy?

In light of the purpose, scope and background of this New York legislation and Congress' relation to it, such an inference of incompatibility has no foundation. In this case we need not imaginatively summon the likely reaction of Congress to the state legislation, as a basis for ascertaining whether due regard for congressional purpose bars the state regulation. Here the States presented their legislative program to cope with an urgent local problem to the Congress, and the Congress unambiguously supported what is at the core of this reform. Had § 8 been written into the compact, even the most subtle casuistry could not conjure up a claim of pre-emption.

Here the challenged state legislation was not in terms approved by Congress, but was part of the legislative history and of the revealed purpose of the compact which was approved. Formal inclusion of § 8 in the compact was not called for since its enforcement was to be unilateral on the part of each State. Both New York and New Jersey enacted § 8 at the time they enacted the proposed compact. Section 8 is the same kind of regulation as is contained in the compact: it effectively disqualifies

ex-felons from waterfront union office, just as the compact makes prior conviction of certain felonies a bar to waterfront employment, unless there is a favorable exercise of executive discretion. The total state legislative program represents a drastic effort to rid the waterfront of criminal elements by generally excluding ex-felons. What sensible reason is there to suppose that Congress would approve the major part of this local effort, as it has expressly done through its approval of the compact, and disapprove its application to union officials who, as history proved, had emerged as a powerful and corrupting influence on the waterfront second to none?

This is not all. As we have seen, § 8 was brought to the attention of Congress as part of the legislation which would come into effect as an adjunct to the compact, and the objection was raised at that time and not heeded that § 8 unduly interfered with federal labor policy. Finally, it is of great significance that in approving the compact Congress did not merely remain silent regarding supplementary legislation by the States. Congress expressly gave its consent to such implementing legislation not formally part of the compact. This provision in the consent by Congress to a compact is so extraordinary as to be unique in the history of compacts. Of all the instances of congressional approval of state compacts—the process began in 1791, Act of Feb. 4, 1791, 1 Stat. 189, with more than one hundred compacts approved since—we have found no other in which Congress expressly gave its consent to implementing legislation. It is instructive that this unique provision has occurred in connection with approval of a compact dealing with the prevention of crime where, because of the peculiarly local nature of the problem, the inference is strongest that local policies are not to be thwarted.

The sum of these considerations is that it would offend reason to attribute to Congress a purpose to pre-empt the

state regulation contained in § 8. The decision in *Hill* v. *Florida*, 325 U. S. 538, in no wise obstructs this conclusion. An element most persuasive here, congressional approval of the heart of the state legislative program explicitly brought to its attention, was not present in that case. Nor was it true of *Hill* v. *Florida*, as it is here, that the challenged state legislation was part of a program, fully canvassed by Congress through its own investigations, to vindicate a legitimate and compelling state interest, namely, the interest in combatting local crime infesting a particular industry.

Appellant also asks us to find evidence of federal preemption of § 8 of the Waterfront Commission Act in the enactment by Congress of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519. Title V of the 1959 Act imposes restrictions upon union officers, and defines qualifications for such officers. Specifically, § 504 (a) provides that "[n]o person . . . who has been convicted of, or served any part of a prison term resulting from his conviction of [a group of serious felonies] . . . shall serve—(1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other employee (other than as an employee performing exclusively clerical or custodial duties) of any labor organization . . . for five years after . . . such conviction or after the end of such imprisonment, unless prior to the end of such five-year period, in the case of a person so convicted or imprisoned, (A) his citizenship rights, having been revoked as a result of such conviction, have been fully restored, or (B) the Board of Parole of the United States Department of Justice determines that such person's service in any capacity referred to in clause (1) . . . would not be contrary to the purposes of this Act."

The fact that Congress itself has thus imposed the same type of restriction upon employees' freedom to choose bargaining representatives as New York seeks to impose through § 8, namely, disqualification of ex-felons for union office, is surely evidence that Congress does not view such a restriction as incompatible with its labor policies. Appellant, however, argues that any state disablement from holding union office on account of a prior felony conviction, such as § 8, which has terms at variance with § 504 (a), is impliedly barred by it. Just the opposite conclusion is indicated by the 1959 Act, which reflects congressional awareness of the problems of pre-emption in the area of labor legislation, and which did not leave the solution of questions of pre-emption to inference. When Congress meant pre-emption to flow from the 1959 Act it expressly so provided. Sections 205 (c) and 403, set out in the margin,[2] are express provisions excluding the operation of state law, supplementing provisions for new federal regulation. No such pre-emption provision was provided in connection with § 504 (a). That alone is sufficient reason for not deciding that § 504 (a) pre-empts § 8 of the Waterfront Commission Act. In addition, two sections of the 1959 Act, both relevant to this case, affirmatively preserve the operation of state laws.

---

[2] Section 205 (c) provides:

". . . No person shall be required by reason of any law of any State to furnish to any officer or agency of such State any information included in a report filed by such person with the Secretary pursuant to the provisions of this title, if a copy of such report, or of the portion thereof containing such information, is furnished to such officer or agency. . . ."

Section 403 provides:

"No labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitution or bylaws, except as otherwise provided by this title. . . . The remedy provided by this title for challenging an election already conducted shall be exclusive."

That § 504 (a) was not to restrict state criminal law enforcement regarding the felonies there enumerated as federal bars to union office is provided by § 604 of the 1959 Act: "Nothing in this Act shall be construed to impair or diminish the authority of any State to enact and enforce general criminal laws with respect to [the same group of serious felonies, with the exception of exclusively federal violations, which are listed in § 504 (a)]." And to make the matter conclusive, § 603 (a) is an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials, except where such pre-emption is expressly provided in the 1959 Act. Section 603 (a) provides: "Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization . . . under the laws of any State . . . ." In view of this explicit and elaborate treatment of pre-emption in the 1959 Act, no inference can possibly arise that § 8 is impliedly pre-empted by § 504 (a).

Appellant's argument that § 8 of the Waterfront Commission Act is contrary to the Due Process Clause of the Fourteenth Amendment depends, as it must, upon the proposition that barring convicted felons from waterfront union office, unless they are pardoned, or receive a "good conduct" certificate, is not, in the context of the particular circumstances which gave rise to the legislation, a reasonable means for achieving a legitimate state aim, namely, eliminating corruption on the waterfront.

In disqualifying all convicted felons from union office unless executive discretion is exercised in their favor, § 8 may well be deemed drastic legislation. But in the view of Congress and the two States involved the situation on the New York waterfront regarding the presence and influence of ex-convicts called for drastic action. Legislative investigation had established that the presence of

ex-convicts on the waterfront was not a minor episode but constituted a principal corrupting influence. The Senate Subcommittee which investigated for Congress conditions on the New York waterfront found that "[c]riminals whose long records belie any suggestion that they can be reformed have been monopolizing controlling positions in the International Longshoremen's Association and in local unions. Under their regimes gambling, the narcotics traffic, loansharking, shortganging, payroll 'phantoms,' the 'shakedown' in all its forms—and the brutal ultimate of murder—have flourished, often virtually unchecked." S. Rep. No. 653, 83d Cong., 1st Sess. (1953), p. 7.

In light of these findings, and other evidence to the same effect,[3] the Congress approved as appropriate if indeed not necessary a compact, one of the central devices of which was to bar convicted felons from waterfront employment, and from acting as stevedores employing others, either absolutely, or in the Waterfront Commission's discretion. No positions on the waterfront were more conducive to its criminal past than those of union officials, and none, if left unregulated, were felt to be more able to impede the waterfront's reform. Duly mindful as we are of the promising record of rehabilitation by ex-felons, and of the emphasis on rehabilitation by modern penological efforts, it is not for this Court to substitute its judgment for that of Congress and the Legislatures of New York and New Jersey regarding the social surgery required by a situation as gangrenous as exposure of the New York waterfront had revealed.

Barring convicted felons from certain employments is a familiar legislative device to insure against corruption in

---

[3] See, e. g., Hearings before Subcommittee No. 3 of the Committee on the Judiciary, House of Representatives, on H. R. 6286, H. R. 6321, H. R. 6343, and S. 2383, 83d Cong., 1st Sess. (1953), pp. 88, 97.

specified, vital areas. Federal law has frequently and of old utilized this type of disqualification. Convicted felons are not entitled to be enlisted or mustered into the United States Army, or into the Air Force, but "the Secretary . . . may authorize exceptions, in meritorious cases." 10 U. S. C. §§ 3253, 8253. This statute dates from 1833. A citizen is not competent to serve on federal grand or petit juries if he has been "convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and and [sic] his civil rights have not been restored by pardon or amnesty." 28 U. S. C. § 1861. In addition, a large group of federal statutes disqualify persons "from holding any office of honor, trust, or profit under the United States" because of their conviction of certain crimes, generally involving official misconduct. 18 U. S. C. §§ 202, 205, 206, 207, 216, 281, 282, 592, 1901, 2071, 2381. For other examples in the federal statutes see 18 U. S. C. § 2387; 5 U. S. C. § 2282; 8 U. S. C. § 1481. State provisions disqualifying convicted felons from certain employments important to the public interest also have a long history. See, e. g., *Hawker* v. *New York*, 170 U. S. 189. And it is to be noted that in § 504 (a) of the 1959 Federal Labor Act, quoted earlier in this opinion, Congress adopted this same solution in its attempt to rid all unions of criminal elements. Just as New York and New Jersey have done, the 1959 Federal Act makes a prior felony conviction a bar to union office unless there is a favorable exercise of executive discretion. In the face of this wide utilization of disqualification of convicted felons for certain employments closely touching the public interest, remitting them to executive discretion to have the bar removed, we cannot say that it was not open to New York to clean up its waterfront in the way it has. New York was not guessing or indulging in airy assumptions that convicted felons constituted a deleterious influence on the waterfront. It was acting on impressive

if mortifying evidence that the presence on the waterfront of ex-convicts was an important contributing factor to the corrupt waterfront situation.

Finally, § 8 of the Waterfront Commission Act is neither a bill of attainder nor an *ex post facto* law. The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt. See *United States* v. *Lovett,* 328 U. S. 303. Clearly, § 8 embodies no further implications of appellant's guilt than are contained in his 1920 judicial conviction; and so it manifestly is not a bill of attainder. The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession. See *Hawker* v. *New York,* 170 U. S. 189. No doubt is justified regarding the legislative purpose of § 8. The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony.

*Affirmed.*

Mr. Justice Harlan took no part in the consideration or decision of this case.

Mr. Justice Brennan is of opinion that Congress has demonstrated its intent that § 8 of the New York Waterfront Commission Act should stand despite the provisions of the National Labor Relations Act, and that the Labor-Management Reporting and Disclosure Act of

1959 explicitly provides that it shall not displace such legislation of the States. He believes that New York's disqualification of ex-felons from waterfront union office, on all the circumstances, and as applied to this specific area, is a reasonable means for achieving a legitimate state aim, and does not deny due process or otherwise violate the Federal Constitution. Accordingly, he agrees that the judgment should be affirmed.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

I could more nearly comprehend the thrust of the Court's ruling in this case if it overruled *Hill* v. *Florida,* 325 U. S. 538, and adopted the dissenting opinion in that case written by my Brother FRANKFURTER. But to sustain this New York law when we struck down the Florida law in the *Hill* case is to make constitutional adjudications turn on whimsical circumstances.

The New York law makes a person ineligible to solicit funds on behalf of a labor union if he has been convicted of a felony. The Florida law made it unlawful for one to be a business agent for a union if he had been convicted of a felony. 325 U. S., at 540. In each the question is whether such a state restriction is compatible with the federal guarantee contained in § 7 of the National Labor Relations Act [1] which reads as follows:

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection. . . ."

---

[1] Section 1 of the Act declared as its purpose encouraging collective bargaining and protecting "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing."

The answer we gave in *Hill* v. *Florida, supra,* at 541, was as follows:

"It is apparent that the Florida statute has been so construed and applied that the union and its selected representative are prohibited from functioning as collective bargaining agents, or in any other capacity, except upon conditions fixed by Florida. The declared purpose of the Wagner Act, as shown in its first section, is to encourage collective bargaining, and to protect the 'full freedom' of workers in the selection of bargaining representatives of their own choice. To this end Congress made it illegal for an employer to interfere with, restrain or coerce employees in selecting their representatives. Congress attached no conditions whatsoever to their freedom of choice in this respect. Their own best judgment, not that of someone else, was to be their guide. 'Full freedom' to choose an agent means freedom to pass upon that agent's qualifications.

"Section 4 of the Florida Act circumscribes the 'full freedom' of choice which Congress said employees should possess. It does this by requiring a 'business agent' to prove to the satisfaction of a Florida Board that he measures up to standards set by the State of Florida as one who, among other things, performs the exact function of a collective bargaining representative. To the extent that § 4 limits a union's choice of such an 'agent' or bargaining representative, it substitutes Florida's judgment for the workers' judgment."

Nothing has been done to change, in relevant part, the language of § 7 of the National Labor Relations Act since *Hill* v. *Florida, supra.* If § 7 foreclosed Florida from prescribing standards for union officials, I fail to see why

it does not foreclose New York. Much is made of the
fact that Congress, when it approved the Waterfront
Commission Compact [2] between New York and New Jer-
sey, 67 Stat. 541, knew of the restrictions contained in § 8
of the New York Waterfront Commission Act [3] now in
litigation. But that is an argument that comes to naught
when Art. XV, § 1 of the Compact is read:

> "*This compact is not designed and shall not be
> construed to limit in any way any rights* granted or

[2] The Waterfront Commission Compact, which Congress approved,
set up qualifications and licensing requirements for certain types of
waterfront employment. It also called for the creation of employ-
ment information centers, to be administered by the bi-state regu-
latory agency, the purpose of which was to eliminate extortionate
hiring practices and regularize employment by eliminating casual
laborers from the registration rolls. It did not purport to regulate
or set up qualifications for labor unions or labor representatives.

[3] Section 8 of Part III of the Waterfront Commission Act of the
State of New York, New York Laws 1953, c. 882, provides as follows:

"No person shall solicit, collect or receive any dues, assessments,
levies, fines or contributions within the state from employees regis-
tered or licensed pursuant to the provisions of this act for or on
behalf of any labor organization representing any such employees, if
any officer or agent of such organization has been convicted by a
court of the United States, or any state or territory thereof, of a
felony unless he has been subsequently pardoned therefor by the
governor or other appropriate authority of the state or jurisdiction
in which such conviction was had or has received a certificate of good
conduct from the board of parole pursuant to the provisions of the
executive law to remove the disability.

"As used in this section, the term 'labor organization' shall mean
and include any organization which exists and is constituted for the
purpose in whole or in part of collective bargaining, or of dealing with
employers concerning grievances, terms and conditions of employ-
ment, or of other mutual aid or protection; but it shall not include
a federation or congress of labor organizations organized on a national
or international basis even though one of its constituent labor
organizations may represent persons so registered or licensed."

derived from any other statute or any rule of law *for employees* to organize in labor organizations, to *bargain collectively and to act in any other way individually, collectively, and through labor organizations or other representatives of their own choosing.* Without limiting the generality of the foregoing, nothing contained in this compact shall be construed to limit in any way the right of employees to strike." (Italics added.)

Yet how can employees maintain their right to act through "representatives of their own choosing" if New York can tell them whom they may not choose?

Moreover the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C. (1958 ed., Supp. I) § 401, shows unmistakably that Congress has kept unto itself control over the qualifications of officers of labor unions. Section 2 (a) of that Act provides in part:

"The Congress finds that, in the public interest, it continues to be the responsibility of the Federal Government to protect employees' rights to organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection . . . ."

Congress by § 504 of that Act has barred enumerated felons from holding union office "during or for five years after" the conviction or end of imprisonment. That federal, not state, qualifications for union offices now obtain is made plain by § 604 of that Act.[4] It provides as follows:

"Nothing in this Act shall be construed to impair or diminish the authority of any State *to enact and*

---

[4] Section 603 (a) of the 1959 Act provides in relevant part that "Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or

*enforce general criminal laws* with respect to robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, or assault which inflicts grievous bodily injury, or conspiracy to commit any of such crimes." (Italics added.)

I do not know how Congress could make clearer its twofold purpose: *first*, that federal standards are to determine the qualifications for holding union offices; and *second*, that enforcement of "general criminal laws" by the States remains unimpaired.

What Congress did in approving the Waterfront Commission Compact and in adopting the Labor-Management Reporting and Disclosure Act of 1959 respected the integrity of *Hill* v. *Florida, supra.* We seem now to forsake it and in effect adopt the dissent in *Hill* v. *Florida.* That I cannot do. For the federal legislative record makes plain to me beyond doubt that Congress has left the qualifications for union offices to be determined by *federal* not *state* law. The Supremacy Clause of Article VI of the Constitution calls for a reversal of the judgment of the New York Court of Appeals. Hence I do not reach the other questions presented.

---

any officer, agent, shop steward, or other representative of a labor organization . . . under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this Act shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State."

This has reference to the fiduciary responsibilities created by § 501 of the Act and makes clear that these provisions of federal law do not pre-empt state law. As stated in S. Rep. No. 187, 86th Cong., 1st Sess., p. 19, "Individual union members will therefore have a choice between suing in the State courts under the common law or invoking the provisions of the Federal statute."

There is no like provision which saves § 504 (the section that bars felons from holding union office) from pre-empting state law.