IN THE MATTER OF THE APPLICATION OF THE WATER-
FRONT COMMISSION OF NEW YORK HARBOR, TO
PUNISH WILLIAM MURPHY FOR FAILURE TO OBEY
A SUBPOENA.

IN THE MATTER OF THE APPLICATION OF THE WATER-
FRONT COMMISSION OF NEW YORK HARBOR, TO
PUNISH JOHN MOODY, Sr. FOR FAILURE TO OBEY
A SUBPOENA.

Argued April 11, 1961—Decided May 22, 1961.

*Mr. Robert Wall* argued the cause for the appellant, William Murphy.

Mr. *Samuel L. Marciano* argued the cause for the appellant, John Moody, Sr. (*Messrs. Florio, Dunn, Marciano & Lypinski,* attorneys; *Mr. Samuel L. Marciano,* on the brief).

Mr. *Robert A. Pin* argued the cause for the respondent, Waterfront Commission of New York Harbor (*Mr. William P. Sirignano,* of the New York Bar, General Counsel; *Mr. Irving Malchman,* of the New York Bar, Assistant to General Counsel).

The opinion of the court was delivered by

PROCTOR, J. This case turns on whether the Waterfront Commission of New York Harbor has jurisdiction to investigate a work stoppage by longshoremen, when the Commissioners have reason to believe that the stoppage was designed to inhibit effective operation of the port watchman system. The defendants, John Moody, Sr. and William Murphy—officials of the striking union—appeal from a judgment of the Superior Court, Law Division, ordering that they be incarcerated until they are willing to answer certain questions addressed to them by the Commission during the course of its investigation. Each was also fined $50. We certified the appeal before argument in the Appellate Division.

The events leading up to the judgment from which defendants appeal are as follows: One James H. Markley was an investigator for the Commission, assigned principally to cover the piers and terminal of the American Export Lines in Hoboken. On or about May 16, 1960, Markley left the employ of the Waterfront Commission in order to work for American Export as a security officer. To fulfill his security functions, Markley obtained a license from the Commission permitting him to operate as a port watchman. On May 16, 1960, the day Markley was to commence work for American Export, the longshoremen and checkers employed by American Export in Hoboken did not report for work. With the exception of the morning of May 17, the work stoppage continued until May 25. The striking employees were members of Hoboken Local No. 2 of the Inter-

national Longshoremen's Association (ILA). Defendant Moody is an organizer for the ILA in New Jersey; and defendant Murphy is business agent for Local No. 2.

The Waterfront Commission had information that the work stoppage was "a concerted effort to keep James H. Markley off the piers of the American Export Lines." Accordingly, it instituted an investigation to determine whether any persons registered or licensed by the Commission were violating the Waterfront Commission Act (*N. J. S. A.* 32:23–1 *et seq.*) by coercing an employer to limit the functions of, or discharge, a licensed port watchman. In connection with the investigation, the Commission served subpoenas ordering the defendants to appear and testify. When defendants appeared, they were informed of the above-described purposes of the investigation. They were also informed that the Commission was proceeding under its statutory authority to make investigations and collect and compile information concerning waterfront practices generally, and all matters relating to the accomplishment of the objectives of the act. The defendants were also told that the Commission was "asking questions to determine the true nature of this work stoppage, to see whether it's a labor dispute or whether there's violation of both the criminal law or the * * * [Waterfront Commission Act]."

Defendant Moody gave his name and address, testified that he was a union official, and refused to answer any other questions. Defendant Murphy testified that he was business agent of Local No. 2 and represented members of the Local working at the American Export facilities in Hoboken. He stated that he knew the longshoremen did not work on May 16, 1960, and that it was common knowledge for the ten days preceding May 16 that things were not normal at the American Export piers. Murphy refused to say whether the abnormal conditions were related to the employment of Markley as port watchman, and he refused to answer any other questions. Neither defendant asserted his privilege against self-incrimination; but each stated, *inter*

*alia,* as a reason for his refusal to answer that the Commission did not have jurisdiction to conduct the investigation.[1] The Commission interrogator overruled the defendants' objections to the questions, directed them to answer, and informed them that continued recalcitrance would subject them to "contempt proceedings." Defendants persisted in their refusal; and subsequently the Law Division, pursuant to a motion by the Commission, and after a hearing, rendered the judgment which imposed a fine upon the defendants and directed their incarceration.

Defendants urge reversal of the judgment below on the ground that, even assuming the purpose of the work stoppage was to subvert the port watchman system, the Commission does not have jurisdiction to investigate it. They argue (1) that the investigation adversely affects or limits "the right to strike" which is expressly reserved by the Waterfront Commission Act (*N. J. S. A.* 32:23–68); and (2) that the Commission's power to investigate is in conflict with and therefore pre-empted by the Labor Management Relations Act (LMRA) (29 *U. S. C. A.* § 141 *et seq.*). Defendants' first argument is encompassed by their pre-emption argument. Article XV, section 1, par. 1 of the Waterfront Commission Act provides:

"* * * nothing contained in this compact shall be construed to limit in any way the right of employees to strike." *N. J. S. A.* 32:23–68.

Assuming, *arguendo,* that investigation and the concomitant power to punish recalcitrant witnesses is in itself regulation, the effect of this statutory provision upon the Commission's power to investigate necessarily depends upon what is meant by the "right to strike." Like most rights, that right is not absolute. A strike is not immune under all conditions from any form of governmental regulation. The Waterfront Act does not purport to define the dimensions of the

---

[1] Defendants' other stated reasons for their refusals to answer are not related to the grounds for reversal urged on this appeal.

right to strike. It therefore merely declares a rule of interpretation which prevents any use of the act to qualify or impede whatever right exists under New Jersey or Federal law. *Cf. International Union v. Wisconsin Empl. Rel. Bd.*, 336 *U. S.* 245, 259, 69 *S. Ct.* 516, 93 *L. Ed.* 651, 665 (1948) (interpreting § 163 of the LMRA, which provides that "Nothing in this subchapter * * * shall be construed so as either to interfere with or impede or diminish in any way the right to strike * * *." 29 *U. S. C. A.* § 163.)

We do not know of any New Jersey law which prevents state investigation of a strike intended to inhibit effective functioning of a security system. If that right exists, it must come from federal law. The applicable federal law is the LMRA and its amendments. By the "right to strike," therefore, defendants must mean that under the federal statute the alleged union activity is either immune from limitation or subject to limitation only by the federal government. So viewed, the argument is that because the work stoppage falls within the purview of the LMRA, the National Labor Relations Board has exclusive primary jurisdiction to deal with it. This is the same as defendants' pre-emption argument and shall be discussed together therewith.

Defendants' pre-emption argument goes as follows: The power to investigate is the power to regulate. A state may regulate union activity only when the activity is clearly not protected by § 7 or prohibited by § 8 of the LMRA. 29 *U. S. C. A.* §§ 157, 158. Otherwise stated, if union activity is arguably protected or prohibited by the federal legislation, the National Labor Relations Board has exclusive primary jurisdiction to deal with it. See *San Diego Bldg. Trades Council v. Garmon*, 359 *U. S.* 236, 79 *S. Ct.* 773, 3 *L. Ed. 2d* 775 (1959). The Waterfront Commission states that the purpose of its investigation is to determine whether defendants' union struck to cause an employer (American Export) to discriminate against one of its employees (Markley). Defendants contend that such a strike is an unfair labor practice under section 8(b)(2) of the LMRA (29

*U. S. C. A.* § 158(b)(2)). Accordingly, the Waterfront Commission has no primary jurisdiction to investigate it.

For reasons subsequently to be discussed, it is unnecessary for us to decide whether the strike by defendants' union arguably falls within the protections or proscriptions of the LMRA. The constitutional doctrine of pre-emption—the exclusion of state power over a particular matter because it is the subject of comprehensive federal regulation—is designed to implement congressional purpose. See *De Veau v. Braisted,* 363 *U. S.* 144, 153, 80 *S. Ct.* 1146, 4 *L. Ed. 2d* 1109, 1116 (1960); *Garner v. Teamsters, C. & H. Union,* 346 *U. S.* 485, 488, 74 *S. Ct.* 161, 98 *L. Ed.* 228, 238 (1953). If by its regulation of a particular activity Congress has exhibited a purpose which is incompatible with the exercise of state power over the same activity, the state power must give way. *San Diego Bldg. Trades Council v. Garmon, supra; Garner v. Teamsters, C. & H. Union, supra.* The applicability of the doctrine to the present case therefore depends upon an answer to the question: Would Congress regard a Commission investigation of a strike designed to limit the effectiveness of the port-watchman system as incompatible or in conflict with federal regulation of labor relations?

The answer to the above question turns on the nature of the Waterfront Commission Act. Our act is a counterpart of one contemporaneously adopted by New York. *L.* 1953, *cc.* 202, 203 (*N. J. S. A.* 32:23–1 *et seq.; N. Y. Laws* 1953, *cc.* 882, 883, *McKinney's Unconsolidated Laws,* §§ 6700–aa *et seq.* It has three parts. Part I (*N. J. S. A.* 32:23–1 to 73) is a compact of sixteen articles entered into by the two states with the consent of Congress (67 *Stat.* 541, *Act of Aug.* 12, 1953, *c.* 407) as required by Article I, section 10 of the Federal Constitution. This part establishes the Waterfront Commission as a bi-state agency, sets forth the purposes of the legislation, and gives to the Commission certain powers essential to fulfillment of those purposes. Part II (*N. J. S. A.* 32:23–74 to 77.3) primarily concerns the

financial administration of the Commission and its programs. And Part III (*N. J. S. A.* 32:23–78 to 108) contains provisions supplementing and implementing the compact of Part I.

A recent United States Supreme Court case relies on congressional approval of the bistate Compact to show that the congressional purpose manifested in federal labor legislation is not incompatible with the exercise of a state power asserted under the Waterfront Act. *De Veau v. Braisted,* 363 *U. S.* 144, 80 *S. Ct.* 1146, 4 *L. Ed. 2d* 1109 (1960). At issue in *De Veau* was the validity of a provision in Part III of the New York Act (New Jersey's Act has a similar provision) which prohibits a waterfront union from collecting dues if any officer of the union has been convicted of a felony and has not been pardoned or given a certificate of good conduct by the parole Board. *McKinney's Unconsolidated Laws,* § 6700–ww (*N. J. S. A.* 32:23–80). The plaintiff, a local union official who had been convicted of grand larceny, was suspended from office because the defendant district attorney threatened to prosecute any person collecting dues for the local so long as the plaintiff remained an officer. The plaintiff sought to have the statutory provision declared unconstitutional and its operation enjoined. His primary argument was that the disputed section of the Waterfront Act was in conflict with and therefore pre-empted by the LMRA, specifically sections 1 and 7 thereof. 29 *U. S. C. A.* §§ 151, 157. Section 1 of the LMRA declares a congressional purpose to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 *U. S. C. A.* § 151. Section 7 grants employees "the right * * * to bargain collectively through representatives of their own choosing." 29 *U. S. C. A.* § 157. The plaintiff argued that pre-emption resulted from the fact that the employees' right to select representatives of their own choosing guaranteed by the

LMRA was interfered with or limited by the Waterfront Act provision disabling them from collecting dues if they select a convicted felon as a representative.

The court rejected the pre-emption argument on the ground that "in light of the purpose, scope and background of * * * [the Waterfront Commission Act] and Congress' relation to it, * * * an inference of incompatibility has no foundation." 363 *U. S.,* at *p.* 153, 80 *S. Ct.,* at *p.* 1151, 4 *L. Ed. 2d,* at *p.* 1116. It noted that the Waterfront Act was passed primarily to eliminate criminal domination of waterfront labor; that its passage followed extensive study of waterfront conditions by New York, New Jersey and Congress; and that Congress concurred in the states' conclusion that statutory measures to control waterfront labor practices were essential to eliminate the then prevailing crime-infested conditions. The court reasoned that by approving the bistate Compact and thus endorsing its goals, Congress manifested an intent not to pre-empt regulation of union officials by the Waterfront Commission.[2]

The principle of *De Veau*—that congressional approval of the bistate Compact indicates the inapplicability of the pre-emption doctrine to a state power derived from the Waterfront Act—applies with even more force to the case before us. For in *De Veau* the disputed section of the Waterfront Act was not part of the Compact expressly consented to by Congress.[3] An examination of the history and structure of

---

[2] The plaintiff in *De Veau* also argued that pre-emption derived from a provision of the *Labor-Management Reporting and Disclosure Act of* 1959, 29 *U. S. C. A.* § 401 *et seq.,* which imposed less restrictive limitations on union officers than the Waterfront Act. The court rejected that argument on the ground that when Congress meant pre-emption to flow from the 1959 act, it expressly so provided.

[3] As previously noted, the disputed section was contained in Part III. Part II and III were not part of the Compact. The Supreme Court reasoned, however, that since Congress was aware of the provisions in Part III when it approved Part I, and since Part III was essential to implementation of Part I, congressional approval extended to the disputed section.

the Waterfront Act shows that the power here asserted by the State is not only essential to fulfillment of the statutory objectives but is accorded by the Compact which Congress approved.

As previously noted, submission of the Compact to Congress was preceded by extensive studies, undertaken by the states and Congress, of conditions on the New York-New Jersey waterfront. For a discussion of these studies, see *Hazelton v. Murray*, 21 *N. J.* 115 (1956), and state and congressional reports cited therein.

The legislative reports all indicate that the act was passed to eliminate racketeering and other evils on the New York-New Jersey waterfront. One evil of specific concern was the domination of the Port Watchmen's union by the ILA. Criminal elements in control of the ILA were thus able to neutralize the effectiveness of the security system, and commit crimes without fear of disclosure. "Through their power as union officials, they [criminal leaders of the ILA] place their confederates in key positions on the docks * * * and carry on such activities as pilferage, loansharking and gambling." *Fourth Report, N. Y. State Crime Commission, N. Y. State Leg. Doc. No. 70, pp.* 23–24 (1953). The extent and effect of former ILA control over watchmen is illustrated by the following excerpts from pages 57, 59, and 63 of the New York report adopted by the New Jersey Law Enforcement Council (*Report of the New Jersey Law Enforcement Council, p.* 3, June 19, 1953.):

"Prior to the Taft-Hartley Act (1947) the Port Watchmen's Union, Local 1456, which represented the New York port watchmen, was an ILA local dominated and controlled by Joseph P. Ryan, John J. (Ike) Gannon, Charles P. Spencer, and their associates. Since the port watchmen were supposed to stop thievery, loansharking, gambling and extortion, and to preserve the peace, they could hardly expect—and did not receive—any support from the officials of the ILA or of its locals.

\* \* \* \* \* \* \*

The close connection of the watchmen's union with the ILA has resulted in watchmen being reprimanded by their union leaders for

reporting a longshoreman for stealing. This situation was developed in the testimony of C. Gulizia, a port watchman (3168–3169):

Q. And did you have occasion during that time to pick up a longshoreman for stealing cargo on that pier? A. Right, sir.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. Turned the man in? To whom? A. To the superintendent, of course. The man, I hear, got four days suspension. The same man went to the union and complained about it.

Q. And he came back to work? A. Well, he didn't come back. Maybe he went to another pier.

Q. But he got a four-day suspension? A. As far as I was told.

Q. He wasn't prosecuted criminally, so far as you know? A. Never.

Q. He wasn't sentenced to jail for larceny, anything of that kind? A. Never. None of them were sent to jail.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. And what did Gannon say about it? A. Well, he says, 'That isn't the right way to do things,' and he says, Gannon says 'If you were to get four days' suspension, how would you like it?'

Q. You mean the president of the Watchmen's Union? A. That's right.

Q. Told you it wasn't right to turn in a man you'd seen actually stealing cargo on the pier? A. That's right. That's right.

The port watchman, next to the rank-and-file longshoreman, is the most tragic figure on the piers.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

When some steamship companies have attempted to increase the effectiveness of their security service they have been met with objections on the part of ILA officials and forced to give up the project. An example was given by F. M. Rohrer of the Grace Line. Rohrer explained what happened when he tried to hire Vincent Tierney to head the Grace Line port police (371):

Q. Did you then tell Mr. Tierney that you had to clear the hiring of Mr. Tierney to replace Mr. English with Gene Sampson, the delegate of 791, and Jay O'Connor, the delegate of 791, and others? A. I don't know as it was mentioned by name, but I probably did tell him that it had to be cleared through the union.

Q. That the hiring of the head watchman had to be cleared— A. (interposing) With the union delegates.

Q. ILA union delegates? A. That's right.

Q. Not the watchmen's delegates? A. No.

Tierney was then employed to make a security study on the piers operated by the Grace Line, but even this met with violent union opposition. In fact, Tierney, an ex-policeman, testified that he had been threatened with death (3889)."

To combat the above-enumerated and other evils, the Compact (the part of the act approved by Congress) grants to the Waterfront Commission authority to license or register

waterfront workers and to regulate hiring practices. Of particular significance to the present case is the fact that the Compact requires port watchmen to be licensed by the Commission (*N. J. S. A.* 32:23–39) and establishes as a condition for receiving and holding a license that a watchman not be a member of a union which represents longshoremen. *N. J. S. A.* 32:23–41(d) and 44(a). To make effective the provisions of the act, the Compact grants the Commission the powers, among others, (1) *"to make investigations, collect and compile information concerning* waterfront practices generally within the port of New York district and upon *all matters relating to the accomplishment of the objectives of this compact."* *N. J. S. A.* 32:23–10(11) [Emphasis added] ; (2) "to administer oaths *and issue subpoenas throughout both States to compel the attendance of witnesses and the giving of testimony* and the production of other evidence." *N. J. S. A.* 32:23–10(8) [Emphasis added] ; and (3) "to make annual and other reports to the Governors and Legislatures of both States containing recommendations for the improvement of the conditions of waterfront labor * * * for the alleviation of the evils described * * * and for the effectuation of the purposes of this compact." *N. J. S. A.* 32:23–10(13). *N. J. S. A.* 32:23–62, also contained in the Compact approved by Congress, provides that failure of any witness when duly subpoenaed to attend or give testimony shall be punishable by the Superior Court, Law Division, in New Jersey, and the Supreme Court in New York in the same manner as such failure is punishable by those courts in a case pending therein. See *In re Application of Waterfront Com.*, 32 *N. J.* 323, 332 (1960).

It is clear from a reading of the legislative reports which preceded passage of the Waterfront Act and a reading of the Compact itself that the creation and maintenance of an independent port watchman system was regarded by both the states and Congress as essential to the creation and preservation of a crime-free waterfront. It is equally clear

that power to investigate any activity which reasonably appears designed to inhibit the effectiveness of the port security system is essential to the maintenance of the watchman's independence and thus to the fulfillment of the ultimate statutory goal. We can think of no sensible reason why Congress would expressly approve the states' effort to rid the waterfront of crime by creating, among other things, an independent watchman system, and yet pre-empt and thus bar application of the expressly granted power to investigate activities which appear detrimental to accomplishment of that goal. *Cf. De Veau v. Braisted, supra,* 363 *U. S.,* at *p.* 153, 80 *S. Ct.,* at *p.* 1151, 4 *L. Ed. 2d* 1109, at *p.* 1116.

Applying the principle of *De Veau* to the case before us, we find that by its express approval of the bistate Compact Congress indicated that exercise of the Commission's investigatory power over a strike which appears designed adversely to affect the port security system does not conflict with the policies and goals of federal labor legislation and that therefore the states' power is not pre-empted by the LMRA.[4] We note that our conclusion is consistent with all other cases we know of in which some provision of the Waterfront Act was alleged to have been pre-empted by federal legislation. In each case the act survived the preemption attack. *Staten Island Loaders v. Waterfront Commission,* 117 *F. Supp.* 308 (*D. C. S. D. N. Y.* 1953), affirmed *Linehan v. Waterfront Comm.,* 347 *U. S.* 439, 74 *S. Ct.* 63, 98 *L. Ed.* 826 (1954); *Linehan v. Waterfront Commission of New York Harbor,* 116 *F. Supp.* 683 (*D. C. S. D. N. Y.* 1953), affirmed 347 *U. S.* 439, 74 *S. Ct.* 623, 98 *L. Ed.* 826 (1954); *Bell v. Waterfront Commission of New York Harbor,* 279 *F. 2d* 853 (2 *Cir.* 1960); *Bradley v. Waterfront Comm. of New York Harbor,* 130 *F. Supp.* 303 (*D. C. S. D. N. Y.* 1955); *O'Rourke v. Waterfront Commission,*

---

[4] The defendants do not urge a conflict between the Commission's power to investigate this strike and any provision of the *Labor-Management Reporting and Disclosure Act of 1959.* 29 *U. S. C. A.* § 401 *et seq.*

118 *F. Supp.* 236 (*D. C. S. D. N. Y.* 1954); *Applegate v. Waterfront Comm. of New York Harbor,* 184 *F. Supp.* 33 (*D. C. S. D. N. Y.* 1960); *Hazelton v. Murray, supra.*

We hold that the Commission may investigate a waterfront work stoppage when the Commissioners have reason to believe that the stoppage is designed to inhibit effective operation of the act. The Commission is entitled to know all of the facts surrounding such a stoppage so that it may intelligently determine whether persons registered or licensed by the Commission have violated any provision of the act and so that it may fulfill its statutory duty of recommending to the state governments measures for the improvement of the conditions on the New York-New Jersey waterfront.

Accordingly, the judgment of the Superior Court, Law Division, is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.