JOHN D. BAKER

*v.*

CIVIL SERVICE COMMISSION OF WEST VIRGINIA

(No. 14071)

Decided June 21, 1978.

*David M. Baker* for appellant.

*Chauncey H. Browning*, Attorney General, *James B. Hoover, Marianne Kapinos*, Assistant Attorneys General, for appellees.

MILLER, JUSTICE:

John D. Baker appeals from an adverse ruling of the Civil Service Commission of West Virginia, which held it had no jurisdiction to consider his case in view of the fact that on May 6, 1977, the Legislature, by virtue of amendments to W.Va. Code, 29-6-1, *et seq.*, removed his position from civil service coverage.

Mr. Baker was an employee in the Governor's Office of Federal-State Relations. On December 23, 1976, his posi-

tion, along with a number of other positions in the Office of Federal-State Relations, was placed under civil service through an Executive Order issued by the Honorable Arch A. Moore, Jr., who was then Governor.

The authority for placing such positions under civil service by executive order was founded on W. Va. Code, 29-6-2. At the time the Executive Order was issued this statute authorized the governor, with the written consent of the Civil Service Commission and the appointing authority concerned, to add to the list of positions in the classified service.

At the 1977 Regular Session of the Legislature, a number of revisions were made to the civil service statutes, one of which precludes the governor from adding to the list of positions in the classified service during the last months of his term in office. W. Va. Code, 29-6-4.[1]

In this same section the Legislature expressly declared that any position placed in the classified service by executive order of the governor during the prohibited time period would not be entitled to the benefits of the classified service. Finally, the Legislature made this prohibition retroactive to the first day of July, 1976.[2]

---

[1] "Except for the period commencing on the first day of July, one thousand nine hundred seventy-six, and ending on the first Monday after the second Wednesday of the following January and except for the same periods commencing in the year one thousand nine hundred eighty and in each fourth year thereafter, the governor may, by executive order, with the written consent of the civil service commission and the appointing authority concerned, add to the list of positions in the classified service, but such additions shall not include the following:"

[2] "All executive orders of the governor adding to the list of positions in the classified service which were dated or issued during the period commencing on the first day of July, one thousand nine hundred seventy-six, and ending on the first Monday after the second Wednesday of the following January or which are dated or issued within the same period commencing in the year one thousand nine hundred eighty or in each fourth year thereafter, shall be null and void, and no person occupying a position added by such executive order to the list of positions in the classified service shall be entitled on account of such order to any right bestowed upon

Following the passage of this legislation, Mr. Baker received written notice that he would be terminated as an employee of the State on July 13, 1977. He was informed his termination was a result of a legislative reorganization which abolished the Office of Federal-State Relations and created the Office of Economic and Community Development. *See* Chapter 85, 1977 Acts of the Legislature.

On July 23, 1977, Mr. Baker protested his dismissal by a letter to the Civil Service Commission which, by an order dated August 26, 1977, held that it was without jurisdiction to consider his case since the Legislature had removed his position from civil service coverage.

It is apparent that there are two legislative enactments which operate against the appellant's position. The first is the 1977 amendments to W.Va. Code, 29-6-2, which bars a governor from placing employees under civil service during the last months of his term of office. The second is the legislative reorganization of certain executive agencies, which had the effect of abolishing the Office of Federal-State Relations where he was employed. Chapter 85, 1977 Acts of the Legislature. If either of these legislative acts is proper, appellant's case fails.

Neither party notes that the two acts are involved and both proceed to address only the validity of the amendments to the civil service statute. Because the two legislative acts are controlling, we address both in this opinion, and because they both relate to the fundamental power of the Legislature to alter the terms of public employment or abolish positions, they flow from a common legal source.

The appellant argues that the Governor's Executive Order validly placed him under civil service and that the civil service statutory amendment removing his position

---

any position or person within the classified service by the provisions of this article or by any rule or regulation promulgated thereunder."

from the classified system violated the doctrine of separation of powers found in Article V, Section 1 of the West Virginia Constitution, and operated to destroy the vested right he had to his position. He also urges that his right to procedural due process was violated since he was not acccorded a hearing. Finally, he asserts that the amended Act is a bill of attainder or *ex post facto* law, and therefore in violation of Article III, Section 4 of the West Virginia Constitution. This latter proposition would be applicable to both acts.

The respondent has raised several matters in connection with the manner in which the Governor's Executive Order was promulgated and the extent of its compliance with some of the technical requirements of W.Va. Code, 29-6-1, *et seq.* However, these arguments are based upon facts that are not in the record and therefore we do not consider these issues on appeal. For purposes of this appeal, we have assumed that the Executive Order placing his position under the Civil Service System was valid.

This Court has in the past had occasion to discuss generally the Civil Service System and has recognized that its basic aim is to provide security of tenure to public employees who are within the system. In *State ex rel. Karnes v. Dadisman,* 153 W. Va. 771, 172 S.E.2d 561 (1970), the Court considered the validity of an executive order placing certain positions within the classified service and reviewed in some detail the mechanical aspects of how coverage is obtained. Our prior decisions, however, are of little value on the issues in this case, which involve the question of the power of the Legislature to enact changes in the Civil Service System that have the effect of withdrawing certain positions from coverage under the classified service.

While the cases of *State v. Morton,* 140 W. Va. 207, 84 S.E.2d 791 (1954), and *Moore v. Strickling,* 46 W. Va. 515, 33 S.E. 274 (1899), can be distinguished factually, since they did not involve the removal of civil service employees, they do suggest that obtaining a public office does not confer a property right. Both cases discuss the pow-

er of the Legislature with regard to the creation of public offices.

The term "public office" in its largest sense encompasses all types of public employment. There is, however, a distinction between a public officer whose office is created by the Constitution or by statute, as well as a distinction between a public officer and an employee. 63 Am Jur. 2d *Public Officers and Employees* § 11, *et seq.; see State ex rel. Crosier v. Callaghan,* W. Va. , 236 S.E.2d 321 (1977); *State ex rel. Carson v. Wood,* 154 W. Va. 397, 175 S.E.2d 482 (1970). Both *Crosier* and *Carson* dealt with the distinction between a public officer and a public employee, and it is clear that the appellant, Mr. Baker, was a public employee.

In *Morton,* this Court decided that members of the West Virginia Turnpike Commission, while appointed by the governor under legislative authorization providing for a specific tenure, could be removed during their term by virtue of W.Va. Code, 6-6-4. We refused to find this Code section unconstitutional as violating the separation of powers provision of our Constitution, Article V, Section 1, or Article VIII, Section 10, which gives the governor power to remove officials he appoints for stated causes. The Court also implicitly recognized that Article IV, Section 8 of the West Virginia Constitution gives the Legislature broad powers to prescribe by general law the terms of office, powers, duties and compensation of all public officers and agents and the manner in which they shall be appointed and removed.

In *Blue vs. Tetrick,* 69 W. Va. 742, 72 S.E. 1033 (1911), this Court held that Article IV, Section 8 of the West Virginia Constitution granted to the Legislature the right to create subordinate executive State offices other than those set out in Article VII, Section 1 of our Constitution, thereby sustaining the validity of the statute creating the office of State Tax Commissioner.

It is readily apparent under the foregoing cases that Article IV, Section 8 vests in the Legislature the right to establish a civil service system for public employees.

This accords with the general rule that the creation of public offices, as well as prescribing the duties and tenure, is primarily a legislative function except as may be restricted by constitutional provisions. 63 Am. Jur. 2d *Public Officers and Employees* § 33.

Once the primary power to create public offices and a civil service system is established in the Legislature, the appellant's argument that the statute voiding the Executive Order which placed appellant's position under civil service violates the separation of powers provision of Article V, Section 1 of our Constitution, must fail. While W.Va. Code, 29-6-2, provided a procedure which enabled a governor under certain conditions to initiate positions into the Civil Service System, this did not elevate his procedural rights to a substantive power that would usurp the Legislature's right to alter the Civil Service System.

In *State ex rel. Musick v. Londeree*, 145 W. Va. 369, 115 S.E.2d 96 (1960), the question was whether a municipality which had by statute been given the right to create a civil service system for its police force and did so, could be required to fill a vacancy for a lieutenant's position which the city apparently deemed not necessary. This Court, after recognizing that the Legislature had granted the municipality rather broad powers in its charter to create and establish employment, and by statutes empowered municipalities to create a civil service system, held those powers did not restrict a municipality from abolishing positions under such system. It concluded, quoting first from 42 Am. Jur. *Public Officers* § 31:

> " 'Every sovereign government has within its own jurisdiction the right and power to create whatever public offices it may regard as necessary to its proper functioning and its own internal administration and to abolish such offices as it may deem superfluous . . .' In 37 Am. Jur, Municipal Corporation, Section 227, we find this statement: '. . . Ordinarily, in the absence of constitutional or statutory restrictions, when a municipal corporation has power to create an office, it may abolish it. An office created by mu-

nicipal ordinance may be abolished by ordinance; thereafter the incumbent ceases to be an officer. ...' " [145 W. Va. at 374]

*See also Hatfield v. Mingo County Court,* 80 W. Va. 165, 92 S.E. 245 (1917).

Numerous cases in other jurisdictions hold that a legislative body has the power to make changes in its public employment, including the civil service system, which changes result in either abolishing positions or diminishing the economic rights of civil service employees. *See, e.g., Miller v. State,* 135 Calif. Rptr. 386, 557 P.2d 970 (1977); *Sevigny v. City of Biddeford,* 344 A.2d 34 (Me. 1975); *Hunt v. Personnel Commission,* 115 N.H. 713, 349 A.2d 605 (1975); *McCarthy v. Sheriff of Suffolk County,* 366 Mass. 779, 322 N.E.2d 758 (1975); *Fuldauer v. City of Cleveland,* 32 Ohio St. 2d 114, 290 N.E.2d 546 (1972); *Crumpler v. County of Logan,* 38 Ill.2d 146, 230 N.E.2d 211 (1967); *Walker v. Massie,* 202 Va. 886, 121 S.E. 448 (1961); *State ex rel. Dahmen v. City of Youngstown,* 40 Ohio App. 2d 166, 318 N.E.2d 433 (1973); *Personnel Division of the Executive Department v. St. Clair,* 10 Or. App. 106, 498 P.2d 809 (1972); Annot., 172 A.L.R. 1366 (1948).

The point is well summarized in *Miller v. State, supra,* which emphasized that public employment arises not by virtue of contract but by the terms and conditions fixed by statute:

> "[I]t is well settled in California that public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law. [Citations omitted] Nor is any vested contractual right conferred on the public employee because he occupies a civil service position since it is equally well settled that '[t]he terms and conditions of civil service employment are fixed by statute and not by contract.' *(Boren v. State Personnel Board* (1951) 37

Cal.2d 634, 641, 234 P.2d 981, 985; . . ." [557 P.2d at 970]

The foregoing law clearly demonstrates that public employment does not confer on an individual a contractual right to a position such that the Legislature cannot abolish or remove the position from civil service coverage. For this reason, appellant's argument that the legislative amendments to the civil service statute impaired his vested right to his position is without merit. The same reasoning would apply to the Act abolishing the Office of Federal-State Relations.

It is important to distinguish between the abolishment of a civil service position and the discharge of the employee from such position. In the present case we are dealing with the right of a legislative body to remove positions from the Civil Service System. Where a classified position has been abolished, the employee ordinarily is not entitled to a procedural due process hearing. The reason is rather obvious - - the abolishment of a position results from the plenary authority of the legislative body which created the position and does not involve a personnel question as to the fitness of the particular employee who holds the position. *Cullen v. Mayor of Newton*, 308 Mass. 578, 32 N.E.2d 201 (1941); *Durbin v. Schneider*, 202 N.E.2d 427, 120 Ohio App. 366 (1964); 15A Am Jur. 2d *Civil Service* § 72, *et seq.*

It is this principle which distinguishes this case from *Waite v. Civil Service Commission*, W. Va. , 241 S.E.2d 164 (1977). There, we recognized that a civil service employee has a "property interest" arising from his tenure of civil service such that he cannot be suspended or dismissed from his employment without being afforded a procedural due process hearing.

*Waite* did not involve the legislative abolishment of a civil service position, but rather the separation of the employee from the position. The continued existence of the position, coupled with the employee's statutory entitlement to tenure, absent proof of the statutory grounds for separation from the position, combined to provide a

"property interest" which required a procedural hearing under the Due Process Clause of our Constitution, Article III, Section 10.

Here, when the Legislature determined, under the power given it in Article IV, Section 8 of our Constitution, that the positions brought into the classified service by the Executive Order in question were not to be covered, then such positions ceased to be covered by civil service tenure, and the employees' "property interest" ceased to exist.

There are, of course, limits to the Legislature's power to remove positions within the Civil Service System, or for that matter to abolish public employment positions generally. In *Londeree*, it was suggested that the legislative action could not be arbitrary or done in bad faith. Certainly, if the legislative enactments created an impermissible classification under the Equal Protection Clause or violated substantive due process principles of our State and Federal Constitutions, it could not stand. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 52 L. Ed. 2d 531, 97 S.Ct. 1932 (1977); *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S.Ct. 1322 (1969); *Woodring v. Whyte*, W. Va. , 242 S.E.2d 328 (1978); *State ex rel. Harris v. Calendine*, W. Va. , 233 S.E.2d 318 (1977). No such constitutional violations are being asserted in this case.

Nor is any claim made by the appellant that the legislative revisions were directly aimed at removal of positions occupied by members of the political party opposite that of the majority of the Legislature. The United States Supreme Court has held that governmental action directed at discharging a public employee merely because of his membership in a political party that is not in control violates his First Amendment right of freedom of association and belief. *Elrod v. Burns*, 427 U.S. 347, 49 L. Ed. 2d 547, 96 S.Ct. 2673 (1976); *see Buckley v. Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659, 96 S.Ct. 612 (1976). This concept provides another limitation on the

power of the Legislature with regard to altering the Civil Service System.[3]

The final point asserted by the appellant is that the legislative changes operating to abolish his position are bills of attainder or *ex post facto* laws, and therefore prohibited by Article III, Section 4 of the *West Virginia Constitution* and Article I, Section 10 of the *United States Constitution*.[4]

While this State has given birth to several notable bill of attainder cases in the United States Supreme Court, there does not appear to be a developed body of law by this Court on the subject. *See Pierce v. Carskadon,* 4 W.

[3] We earlier noted that appellant's position was abolished along with other positions in the Office of Federal-State Relations when the Legislature reorganized the functions of several other agencies into the Office of Economic and Community Development. The Department of Commerce was also abolished in this legislative reorganization. Chapter 85, 1977 Acts of the Legislature.

[4] Appellant does not press the *ex post facto* argument apparently in recognition that this concept generally applies to criminal or penal statutes. 16 Am. Jur. 2d *Constitutional Law* § 396 *et seq.*; 16A C.J.S. *Constitutional Law* §435, *et seq.; Calder v. Bull,* 3 U.S. 386, 1 L. Ed. 648 (1798). We recognize that the United States Supreme Court has given a broad interpretation to the term "penal." *See, e.g., Ex parte Garland,* 71 U.S. 333, 18 L. Ed 366 (1866); *De Veau v. Braisted,* 363 U.S. 144, 4 L. Ed. 2d 1109, 80 S.Ct. 1146 (1960); *Fleming v. Nestor,* 363 U.S. 603, 4 L. Ed. 2d 1435, 80 S.Ct. 1367 (1960). The line between a bill of attainder and an *ex post facto* law is often blurred, as evidenced by this statement from *De Veau v. Braisted, supra:*

"The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt. See United States v Lovett, 328 US 303, .... The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession. ..." [363 U.S. at 160]

For purposes of this case, we treat the bill of attainder discussion as also dispositive of the *ex post facto* issue. In other cases the concepts may not overlap.

Va. 234 (1870), *rev'd*,83 U.S. 234, 21 L. Ed. 276 (1872) (holding an act barring access to courts unless loyalty oath taken a bill of attainder); *Dent v. West Virginia*, 25 W.Va. 1 (1884), *aff'd*,129 U.S. 114, 32 L. Ed. 623, 9 S.Ct. 231 (1889) (upholding statute requiring state medical license as not a bill of attainder.)

For purposes of this case, we would draw our constitutional provision against a bill of attainder as following the contours set by the United States Supreme Court in construing the same prohibition in the Federal Constitution.[5]

A bill of attainder originated in England and connoted an act of Parliament sentencing named individuals or identified members of a group to death, based on their prior activities which were "politically abhorent" to the current legislative majority. *Nixon v. Administration of General Services*, 433 U.S. 425, 53 L. Ed. 2d 867, 97 S.Ct. 2777 (1977).

In *United States v. Brown*, 381 U.S. 437, 14 L. Ed. 2d 484, 85 S.Ct. 1707 (1965), the Court treated at some length the historical development of bills of attainder both in England and this country, pointing out that the term embraces "bills of pain and penalties," which was a term given where the penalty was other than death, and observed:

> "The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." [381 U.S. at 442]

In *Nixon*, the Court summarized the current state of the law in this area, stating:

---

[5] Article I, Section 9 of the United States Constitution prohibits Congress from passing a bill of attainder, and Article I, Section 10 places the same proscription against the states.

"Our country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly deployed against those legislatively branded as disloyal. See, e.g., Cummings v. Missouri, supra [4 Wall 277, 323, 18 L. Ed. 356 (1867)] (barring clergymen from ministry in the absence of subscribing to a loyalty oath; United States v. Lovett, supra [328 U.S. 303, 315-316, 90 L. Ed. 2d 1252, 66 S.Ct. 1073 (1946)] (barring named individuals from government employment; United States v. Brown, supra [381 U.S. 437, 14 L. Ed. 2d 484, 85 S.Ct. 1077 (1965)] (barring Communist Party members from offices in labor unions)." [433 U.S. at 474-75]

The Court in *Nixon* also concluded that in determining whether a given statute leveled punishment, a functional test would be applied to determine "whether the law under challenge viewed in terms of the type and severity of burdens imposed can be said to further nonpunitive legislative purposes." 433 U.S. at 475-78.

While *Nixon* was not concerned with the issue of whether the legislation singled out persons for punitive treatment since the Act was aimed solely at him, this question did arise in *Fleming v. Nestor*, 363 U.S. 603, 4 L. Ed. 2d 1435, 80 S.Ct. 1367 (1960). There, the Court emphasized that the object of the legislation must be directed at the person and not the position. It quoted from *De Veau v. Braisted*, 363 U.S. 144, 4 L. Ed. 2d 1109, 80 S.Ct. 1146 (1960):

" 'The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession.' " [363 U.S. at 160]

We believe that appellant's bill of attainder argument must fail for two reasons. First, it cannot be said that the legislative enactments are directed at any identifiable group whose prior conduct or status is the motivating reason for the legislation that abolished their positions. It is clear that the appellant, Baker, has not been singled out for exclusive treatment by the deprivation of his position only. Both enactments obviously affect a number of other public employees and there is no suggestion that all of these individuals form an identifiable group in the sense that they shared a common conduct or status that motivated the Legislature to act against them punitively by abolishing their positions.

Moreover, there are legitimate legislative aims that can be found from the face of both legislative enactments which support the conclusion that the enactments did not arise from a punitive motive. The Legislature could properly conclude that some time restraint should be placed on a governor's statutorily given right to place positions under the Civil Service System. If a governor during his term of office wishes to initiate positions into the Civil Service System, he has ample time under the present enactment to do so. What he cannot now do is wait until the eve of his departure from office to take such action.

It is this eleventh-hour activity which raises the question that the motivating force is not to secure the tenure of civil service for competent employees, but to lock certain political appointees into the Civil Service System so that the incoming governor may not be able to remove them. Certainly the facts in *State ex rel. Karnes v. Dadisman*, 153 W. Va. 771, 172 S.E.2d 561 (1970), and *State ex rel. Clark v. Dadisman*, 154 W. Va. 340, 175 S.E.2d 422 (1970), suggest it was this type of practice that the Legislature sought to abolish.

Clearly, the legislative act designed to reorganize the functions of several executive offices and agencies into the Office of Economic and Community Development

bears the indicia of legitimate government reorganization. If the Legislature could be prohibited by the courts each time it determined to reorganize public offices because some of the employees thereby lost their positions, then no effort would be made to prune back a rampant bureaucracy.

We, therefore, find that these legislative enactments carry the imprint of valid legislative purposes such that we cannot say they had as their underlying motive the design to punish the appellant by depriving him of his position as a result of his prior conduct or status. In consequence, the enactments cannot be characterized as a bill of attainder.

For the foregoing reasons, we affirm the order of the Civil Service Commission.

*Affirmed.*