THOMAS HAZELTON AND NICHOLAS MASCHUCCI, PLAIN-TIFFS-RESPONDENTS, v. FRANK MURRAY, CHESTER JURGELSKI, JAMES CALABRESE, AND LOCAL 1247, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, DEFENDANTS-APPELLANTS, AND STATE OF NEW JER-SEY, INTERVENOR-RESPONDENT.

Argued February 13, 1956—Decided March 5, 1956.

Mr. *James F. McGovern, Jr.,* argued the cause for appellants (*Mr. Louis P. Caroselli,* on the brief).

Mr. *Harold Kolovsky* argued the cause for intervenor-respondent (*Mr. Grover C. Richman,* Attorney-General of New Jersey, attorney; *Mr. David M. Satz, Jr.,* on the brief).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   James Calabrese, convicted in 1949 of a crime equivalent to a high misdemeanor and not since pardoned or otherwise relieved of the disabilities arising therefrom, was, on August 5, 1954, elected financial secretary and treasurer of Local 1247 of the International Longshoremen's Association.   In this action the Chancery Division entered a judgment which restrains Calabrese from exercising the powers and duties of the office and declares that the same is vacant and shall be filled in accord with the constitution, by-laws and rules of order of the International Longshoremen's Association.   Calabrese appealed to the Appellate Division, and we certified the appeal here on our own motion.

Judge Stanton, of the Chancery Division, entered the judgment for the reason, recited therein, that *"Revised Statutes of New Jersey, Title* 32:23–80 prohibits the collection of union funds by persons disqualified by virtue of the conviction of crimes equivalent to high misdemeanor and \* \* \* said statute represents a valid and legal exercise of the police power of the State of New Jersey \* \* \*." The statute, which is section 8 of Part III of the Waterfront Commission Act, *L.* 1953, *c.* 202, *c.* 203, *N. J. S. A.* 32:23–1 to 32:23–98, reads as follows:

> "§ 8. *Collection of funds for unions having officers or agents who are felons.* No person shall solicit, collect or receive any dues, assessments, levies, fines or contributions, or other charges within the State of New Jersey from employees registered or licensed pursuant to the provisions of this act for or on behalf of any labor organization representing any such employees if any officer or agent of such organization has been convicted by a court of the United States, or any State or territory thereof, of treason, murder, manslaughter or any felony, high misdemeanor or misdemeanor involving moral turpitude, unless he has been subsequently pardoned therefor by the Governor or other appropriate authority of the State or jurisdiction in which such conviction was had or has received a certificate of good conduct or other relief from disabilities arising from the fact of conviction from a board of parole or similar authority.
>
> As used in this section, the term 'labor organization' shall mean and include any organization which exists and is constituted for the purpose in whole or in part of collective bargaining, or of dealing with employers concerning grievances, terms and conditions of employment, or of other mutual aid or protection; but it shall not include a federation or congress of labor organizations organized on a national or international basis even though one of its constituent labor organizations may represent persons so registered or licensed.
>
> Any person who shall violate this section shall be guilty of a misdemeanor punishable by a fine of five hundred dollars ($500.00) or imprisonment for one year, or both."

Our Waterfront Commission Act is the counterpart of the statute of the same name contemporaneously adopted by the State of New York, *New York Laws* 1953, *c.* 882, *c.* 883, *McKinney's Unconsolidated Laws, sections* 6700aa–6700zz. The act has three parts. Part I is a compact of sixteen articles entered into by the two states with the consent of the Congress of the United States as required by *Art.* I, *sec.* 10

of the *Federal Constitution*. 67 *Stat.* 541, *Act August* 12, 1953, *c*. 407. Part II is primarily concerned with the details of the administration of a plan for assessments against employers to meet the expenses of administration of the bi-state Waterfront Commission of New York Harbor created by the compact. Part III contains provisions supplemental to and in aid of the compact articles and includes the section here in question.

Appellant's brief is limited to constitutional questions. He does not question the trial court's construction of *section* 32:23–80. We therefore assume that Calabrese is satisfied that the terms of the statute, as was held below, disqualified him from functioning as an officer of the labor organization and justified the restraint against him and the declaration that the office is vacant. We shall consider and decide the constitutional questions in relation to the statute as so construed.

Unconstitutionality of the section is urged upon the grounds *first,* that the compact and the section invade constitutionally secured individual rights—that it is an *ex post facto* law, a law in the nature of a bill of attainder, a law which imposes cruel and inhuman punishment; *second,* that due process is denied him in disqualifying him for the union office without affording him an opportunity to show his fitness therefor despite the conviction; *third,* that his disqualification for the office because of the conviction is not reasonably and substantially related to the ends sought to be attained by the compact and so the section must be deemed unreasonable, arbitrary and capricious and violative of rights secured by the Fifth and Fourteenth amendments to the Federal Constitution; *fourth,* that the members of the union are denied the equal protection of the laws because of the restriction upon their rights guaranteed by the National Labor Relations Act to select representatives of their own choosing; and *fifth,* that the Congressional consent to the compact was invalid because inhibited by *Art.* I, *sec.* 9, *clause* 6 of the *Federal Constitution* providing that "No Preference shall be given by any Regulation of Commerce or Revenue to the

Ports of one State over those of another * * *"—this because the compact provides for assessments against employers to defray the expenses of administration of the Waterfront Commission.

None of these grounds has substance. The United States Supreme Court has recently sustained federal court decisions adjudging that the Compact Act in its entirety is a reasonable exercise of the police power of the States of New York and New Jersey and thus has established the invulnerability of *section* 32:23–80 to all of the grounds of attack leveled against it by appellant. *Linehan v. Waterfront Commission of New York Harbor*, 116 *F. Supp.* 683 (*D. C. S. D., N. Y.* 1953); *Staten Island Loaders v. Waterfront Commission*, 117 *F. Supp.* 308 (*D. C. S. D., N. Y.* 1953). Both decisions were affirmed without majority opinion in 347 *U. S.* 439, 74 *S. Ct.* 623, 98 *L. Ed.* 826 (1954). See also *Bradley v. Waterfront Comm. of New York Harbor*, 130 *F. Supp.* 303 (*D. C. S. D., N. Y.* 1955), *O'Rourke v. Waterfront Commission*, 118 *F. Supp.* 236 (*D. C. S. D., N. Y.* 1954). Especially pertinent is the holding in *Linehan* that there is no constitutional infirmity in the provisions of the compact authorizing the Waterfront Commission in its discretion to deny registration to longshoremen who have been found guilty of specified crimes. "Since we hold the Act is within the police power of the State, the numerous objections to it generally based on violations of the Constitution would all seem to be without foundation. This is a new type of regulation, drawn to meet an emergency and reasonably related to the public interest." 116 *F. Supp.*, at *page* 685.

There are a number of provisions of the compact which give special significance to the conviction of crime as a consideration in determining eligibility for waterfront work. Under *N. J. S. A.* 32:23–14 no application for a license to act as pier superintendent or hiring agent may be granted "if the prospective licensee has, without subsequent pardon, been convicted" of a crime mentioned therein unless the Commission, in its discretion, issues an order removing his ineligibility upon a showing of good conduct for a period

not less than five years measured as provided by the statute. Under *N. J. S. A.* 32:23–20 the same provision is made as to any member, officer or stockholder of a stevedoring organization. *Section* 32:23–41 authorizes the denial of a license as a port watchman to such convicted person and there is no exception based upon a showing of at least five years' good conduct. And *section* 32:23–29 allows the Commission in its discretion to deny such convicted person inclusion in the longshoremen's register.

The reasons for these provisions and *section* 32:23–80, and the connection of all with the public interest abundantly appear.

New York Harbor spans the States of New York and New Jersey and a score of municipalities. It embraces over 700 miles of protected shoreline and thousands of landings and ship berths. "Ever since colonial times New York has stood unchallenged as the Nation's chief maritime gateway." *Senate Report No.* 653, 83*d Cong., 1st Sess., p.* 6 (July 27, 1953). But a serious threat to the port's supremacy and economic wellbeing developed over recent decades, the nature and scope of which was fully disclosed in state and federal inquiries conducted during the year or two preceding the making of the compact. See *Fourth Report of the New York State Crime Commission, N. Y. State Leg. Doc.* 70 (1953), *Final Report to the New York State Industrial Commissioner from the Board of Inquiry on Longshoremen Industry* (1953); *Report of the New Jersey Law Enforcement Council* (June 19, 1953), *Senate Report No.* 653, *supra, Hearings before Sub-Committee of Committee on Judiciary, H. R.* 83*d Cong., 1st Sess.,* July 1953, *Presentment of the Hudson County Grand Jury,* 1950 *term, 3d sess.,* filed December 5, 1952.

This threat lay in the fact that criminals, racketeers and hoodlums had acquired a stranglehold upon port activities through their control of key positions in a large number of the 64 locals of the International Longshoremen's Association (eleven of the locals were New Jersey locals), which numbered in its membership not alone the longshoremen but

as well the pier superintendents and hiring agents who employed and supervised their work; and the membership also included the so-called "public loaders" who . intruded an apparently unnecessary and uneconomic activity into the work of transferring cargo between pier and truck.

The public hearings on the *New York Crime Commission's Fourth Report,* conducted by Governor Dewey on June 8 and 9, 1953, developed the fact, as one witness phrased it, that "* * * it is certain and evident that the ILA in this harbor is a racket union"; "* * * the basic problem on the waterfront is not crime, but how to get a decent labor-management set-up, free of the control of racketeers. The basic problem is not law enforcement, but how to make the waterfront law-enforceable by stripping the racketeers of their false union coloration." *Public Hearings Record, p.* 119. The *Fourth Report* recounts "the exploitation and betrayal of the rank and file dock worker by his ILA officials and representatives," *p.* 19; "It was established that at least 30 per cent of the officials of the ILA longshoremen locals have police records. Waterfront criminals know that the control of the local is a prerequisite to conducting racket operations on the piers. Through their power as union officials, they place their confederates in key positions on the docks, shake down steamship and stevedoring companies by threats of work stoppages, operate the lucrative public loading business, and carry on such activities as pilferage, loansharking and gambling." (*pp.* 23–24)

And *Senate Report No.* 653, *supra* (which we observe devotes over two-thirds of its length to conditions on the New Jersey docks, including the activities of Local 1247, here involved), in finding that "New York has America's toughest and foulest waterfront," summarized the general condition throughout the port as follows:

"(b) *Criminal exploitation and extortion.*—Criminal elements and criminal activities are firmly entrenched on the waterfront, primarily through their grip on the organized labor movement. For many years it has been generally accepted that the place for an ex-convict to find employment is around the docks. This, standing alone, would not be objectionable; no doubt many men who have paid their debts

to society have been able to make a new start in such employment. But in this instance the scales have tipped the other way : the water-front is not where a man can 'go straight'—it is where he can keep crooked. Criminals whose long records belie any suggestion that they can be reformed have been monopolizing controlling positions in the International Longshoremen's Association and in local unions. Under their regimes gambling, the narcotics traffic, loan-sharking, short-ganging, payroll 'phantoms,' the 'shakedown' in all its forms—and the brutal ultimate of murder—have flourished, often virtually unchecked." (*p. 7*)

There is also ample proof that conditions in the New Jersey segment of the port were not at all different either in kind or degree. So in the *Report of the Law Enforcement Council* to Governor Driscoll of June 19, 1953, *supra.* appears, at *page 3* :

"The New Jersey Law Enforcement Council agrees with and joins in the findings of the N. Y. Commission with reference to the conditions and evils existing on the waterfront in the Port of New York and is satisfied from its own investigation, from the evidence produced at its private hearings and the testimony produced at the public hearings in New York and New Jersey that the same pattern of evils and abuses exists in the New Jersey portion of the Port."

And in the *Presentment of the Hudson County Grand Jury, supra,* are these corroborative findings :

"We are convinced that the rank and file of the longshoremen and checkers are honest, upright, decent, and hard-working members of the community. The same, however, cannot be said about the officials of the International Longshoremen's Association. We had a parade of individuals before this Grand Jury who held various offices and positions and who are ex-convicts and racketeers. We found from testimony by qualified and decent labor leaders that the International Longshoremen's Association is not a union in the accepted sense of its designation. * * * The control of a Local of the International Longshoremen's Association is also of great importance to the racketeers, hoodlums, and ex-convicts, because of the pecuniary benefit they may derive therefrom. As a result, we know that in order to gain control of an International Longshoremen's Association Local, atrocious assaults, batteries, bombings, and attempted murder were committed." (*pp. 10–11*)

It had long been known that instability and irregularity existed in waterfront employment for reasons having no

connection with domination of the labor organization by criminal elements.  See *Report on Dock Employment in New York City and Recommendations for its Regularization* (1916), *TDB, p. v.* 91, New York Public Library, *Report of Joint Legislative Committee on Unemployment* (1932), *New York State Leg. Doc.* 69. The compact undoubtedly aims at remedying these underlying problems in abolishing the "public loader" activity and in substituting for the so-called "shape up" system of hiring the requirement that longshoremen and port watchmen shall be hired only through employment information centers operated by the Waterfront Commission.  Doubtless, too, the requirements for the licensing of pier superintendents and hiring agents, and of stevedores and port watchmen, and the provision for the registration of longshoremen, with the limitations against hiring or acceptance of employment unless licensed or registered, as the case may be, have in view the correction of the basic causes for instability and irregularity in waterfront employment.

But it is strikingly apparent that, so long as criminal elements, bent upon exploitation of employer and employee for corrupt motives, dominated the waterfront, through their control of the workers' labor organization, progress toward solution of the basic difficulties through free collective bargaining or other lawful means, was virtually impossible. The first and immediate need, then, was to break the grip of the racketeers and hoodlums.

In that circumstance we perceive, as did the federal courts, the unquestioned office in the public interest of the several provisions of the compact aimed at removing convicted criminals from the waterfront, and, in the case of *section* 32 :23–80, from positions of power and influence in the labor organization.  If the conviction of crime is a proper consideration related to the public interest for the purposes of licensing and registering waterfront workers, much more so is the provision here under review which would wrest from the vicious criminal combine the means through which the corrupt conspiracy was perpetrated.

The Legislatures of the two states incorporated their findings and declarations supporting the provisions of the compact in Article I as follows (*L.* 1953, *c.* 202, *pp.* 1511 *et seq.*):

## "ARTICLE I
### FINDINGS AND DECLARATIONS.

1. The States of New Jersey and New York hereby find and declare that the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to availability of employment, corrupt hiring practices *and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character* and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment and a loss of respect for the law; that not only does there result a destruction of the dignity of an important segment of American labor, but a direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the Port of New York district.

2. The States of New Jersey and New York hereby find and declare that many of the evils above described result not only from the causes above described but from the practices of public loaders at piers and other waterfront terminals; that such public loaders serve no valid economic purpose and operate as parasites exacting a high and unwarranted toll on the flow of commerce in and through the Port of New York district, and have used force and engaged in discriminatory and coercive practices including extortion against persons not desiring to employ them; and that the function of loading and unloading trucks and other land vehicles at piers and other waterfront terminals can and should be performed, as in every other major American port, without the evils and abuses of the public loader system, and by the carriers of freight by water, stevedores and operators of such piers and other waterfront terminals or the operators of such trucks or other land vehicles.

3. The States of New Jersey and New York hereby find and declare that many of the evils above described result not only from the causes above described but from the lack of regulation of the occupation of stevedores; that such stevedores have engaged in corrupt practices to induce their hire by carriers of freight by water and to induce officers and representatives of labor organizations to betray their trust to the members of such labor organizations.

4. The States of New Jersey and New York hereby find and *declare that the occupations of longshoremen, stevedores, pier super-*

*intendents, hiring agents and port watchmen are affected with a public interest requiring their regulation and that such regulation shall be deemed an exercise of the police power* of the two States for the protection of the public safety, welfare, prosperity, health, peace and living conditions of the people of the two States." (Emphasis supplied)

In the light of these findings of the scope and nature of the local problem, and the decisional precedent of the *Linehan* and *Staten Island Loaders* cases that the compact is a reasonable exercise of the police powers of the states, neither inhibited by the guarantees of the Federal Constitution nor a prohibited trespass upon any area superseded by federal action, the lack of merit in appellant's attack on its constitutionality is fully demonstrated. And that attack gains no strength from the construction of *section* 32:23–80 to impose an absolute ban against the holding of the union office by the convicted criminal. A dispositive analogy is found in the decision in the *Staten Island Loaders* case. There the absolute prohibition against engaging in the calling of public loader was sustained upon the ground that it was not unreasonable or arbitrary since "the proof shows that the exercise of this calling by public loaders in New York Harbor has been accompanied by such flagrant abuses that it is against the public interest to allow them to continue. There is no proof that these abuses will not continue in the future and the Legislature has found that they are inherent in the system itself. In our opinion these findings justify the legislation." 117 *F. Supp.*, at *page* 310. Even more cogent are these observations to the matter of convicted criminals holding places as officers or agents of labor organizations representing waterfront workers in the Harbor. The record in the instant case is absolutely barren of any proofs that the conditions which so plainly justified *N. J. S. A.* 32:23–80 have in anywise changed. Too, it is not for us to pass judgment whether regulation rather than absolute disqualification from union offices would have met the need. That argument was also advanced in the *Staten Island Loaders* case as to the ban against public loaders and was rejected with the comment,

"* * * it is not for the judiciary to decide whether the legislature has chosen the best remedy to meet an evil. The court decides only whether the means chosen are constitutional and related to the evil sought to be abolished. * * * In making its decision to prohibit public loading it is to be presumed that the legislature made a conscious and careful choice, based on long study and consideration. We cannot say that the remedy chosen is unreasonable." 117 *F. Supp.*, at *pages* 310-311.

Appellant's argument that Local 1247's members are denied the equal protection of the laws because the statute has the effect of a limitation upon their rights under the National Labor Relations Act to select representatives of their own choosing is answered both by the *Staten Island Loaders* decision, and by the later decision in *Bradley v. Waterfront Comm. of N. Y. Harbor, supra.* In the *Loaders* case it was argued that the compact encroached upon the exclusive jurisdiction of Congress over maritime matters. The court said, 117 *F. Supp.*, at *page* 311:

"But whether or not public loading comes within the maritime jurisdiction, it has always been clear that a State may legislate on matters affecting interstate commerce and the maritime industry which are purely local in nature. * * * a State may exercise its police power in the maritime field to protect the public health and safety. It is clear that the control and regulation permitted by the Compact over the waterfront in New York Harbor clearly concerns such public interests. Moreover, the registration of longshoremen and stevedores and the prohibition of public loading are matters of local concern in which the need for uniformity throughout the United States does not exist."

In the *Bradley* case the provisions governing registration and hiring of longshoremen were attacked as restrictive of the rights guaranteed workers by the Wagner and Taft-Hartley Labor legislation. The argument was disposed of with the comment, "* * * the Court is of the view that the Supremacy claim is insubstantial. It is to be noted that the very same claims of Supremacy, stated as such or in the guise of a 'pre-emption' contention, were made in the Linehan and Staten Island cases." 130 *F. Supp.*, at *pages* 311–312.

*O'Rourke v. Waterfront Commission, supra,* should also be mentioned. There an attempt to have a three-judge statu-

tory court convene was unsuccessful. This was an attack upon Article V of the compact, which requires that pier superintendents and hiring agents who respectively supervise and select the longshoremen for hire must be licensed by the Waterfront Commission. As noted earlier, there is a provision in the article that a license may be denied an applicant when he has without subsequent pardon been convicted of specified crimes, except that the Commission has discretion to remove the ineligibility of such convicted persons when warranted by the applicant's conduct for a period of at least five years.

Noting that all of the constitutional infirmities advanced were presented to, considered and rejected by two statutory courts, in *Linehan* and *Staten Island Loaders* dealing with the registration of longshoremen under Articles VII and IX and the prohibition of public loading under Article VII, the court found no additional merit in the same attacks as related to Article V. It was particularly emphasized that "In the Linehan case the discretionary power granted to the Waterfront Commission to refuse registration to a longshoreman based upon conviction of crime, as well as the other criteria specified in the Act, was held not to violate the Constitution and to be a reasonable exercise of the state's police power." 118 *F. Supp.*, at *page 237*.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.