PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 14-3956, 14-3957, 14-3958, 14-4278, 14-4279, 14-4422
_____

NEW YORK SHIPPING ASSOCIATION INC, on behalf of
its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS' ASSOCIATION, INC.,
on behalf of its members; INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION AFL-CIO, on behalf
of its members and affiliated locals in the Port of New York
and New Jersey; LOCAL 1804-1, INTERNATIONAL
LONGSHOREMENS ASSOCIATION, AFL-CIO; LOCAL
1814, INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO, on behalf of its members

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

New York Shipping Association Inc.,
Appellant in 14-3956
____

NEW YORK SHIPPING ASSOCIATION INC, on behalf of
its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS ASSOCIATION, INC.

on behalf of its members; INTERNATIONAL
LONGSHOREMENS ASSOCIATION AFL-CIO,
On behalf of its members and affilated locals in the Port of
New York and New Jersey;  LOCAL 1804-1,
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,
AFL-CIO;LOCAL 1814, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

International Longshoremen's Association, AFL-CIO,
Local 1804-1, International Longshoremen's Association,
AFL-CIO, Local 1814, International
Longshoremen's Association, AFL-CIO,
                                   Appellants in 14-3957
                            ____

NEW YORK SHIPPING ASSOCIATION INC, on behalf of
its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS' ASSOCIATION, on
behalf of its members; INTERNATIONAL
LONGSHOREMENS ASSOCIATION AFL-CIO, on behalf
of its members and affiliated locals in the Port of New York
and New Jersey; LOCAL 1804-1, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO; LOCAL
1814, INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO, on behalf of its members

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

Metropolitan Marine Maintenance Contractors'
Association, Inc.,

Appellant in 14-3958

____

NEW YORK SHIPPING ASSOCIATION INC, on behalf of
its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS ASSOCIATION,
on behalf of its members; INTERNATIONAL
LONGSHOREMENS ASSOCIATION AFL-CIO,
on behalf of its members;  INTERNATIONAL
LONGSHOREMENS ASSOCIATION LOCAL 1804-1,
on behalf of its members; INTERNATIONAL
LONGSHOREMENS ASSOCIATION 1814,
on behalf of its members

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

New York Shipping Association, Inc.,

Appellant in 14-4278

____

NEW YORK SHIPPING ASSOCIATION INC,
on behalf of its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS ASSOCIATION,
on behalf of its members;INTERNATIONAL
LONGSHOREMENS ASSOCIATION 1814,
on behalf of its members;

3

INTERNATIONAL LONGSHOREMENS ASSOCIATION
LOCAL 1804-1, on behalf of its members;
INTERNATIONAL LONGSHOREMENS ASSOCIATION
AFL-CIO, on behalf of its members

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

International Longshoremen's Association, AFL-CIO;
International Longshoremen's Association 1814,
International Longshoremen's Association 1804-1;
Appellants in 14-4279

____

NEW YORK SHIPPING ASSOCIATION INC, on behalf of
its members; INTERNATIONAL LONGSHOREMENS
ASSOCIATION 1814, on behalf of its members;
INTERNATIONAL LONGSHOREMENS ASSOCIATION
AFL-CIO, on behalf of its members;
INTERNATIONAL LONGSHOREMENS ASSOCIATION
LOCAL 1804-1, on behalf of its members;
METROPOLITAN MARINE MAINTENANCE
CONTRACTORS ASSOCIATION, on behalf of its members

v.

WATERFRONT COMMISSION OF
NEW YORK HARBOR

Metropolitan Marine Maintenance

Contractors Association Inc.,
                                    Appellant in 14-4422
                      _____

On Appeal from the United States District Court
        for the District of New Jersey

        (D.C. Civil No. 2-13-cv-07115)
District Judge: Honorable Susan D. Wigenton

            ARGUED JULY 9, 2015

        BEFORE: FUENTES, NYGAARD,
          and ROTH, *Circuit Judges*


            (Filed: August 30, 2016)

James R. Campbell, Jr., Esq.
Donato Caruso, Esq. [Argued]
The Lambos Firm
303 South Broadway, Suite 410
Tarrytown, NY 10591
        *Counsel for Appellant New York*
        *Shipping Association, Inc.*

Kevin J. Marrinan, Esq. [Argued]
John P. Sheridan, Esq.
Marrinan & Mazzola Mardon
26 Broadway, 17th Floor
New York, NY 10004
        *Counsel for Appellants International*
        *Longshoremen's Association AFL-CIO, International*

*Longshoremen's Association AFL-CIO Local1804-1, and International Longshoremen's Association AFL-CIO Local 1814*

Peter O. Hughes, Esq. [Argued]
Ogletree, Deakins, Nash, Smoak & Stewart
10 Madison Avenue, Suite 400
Morristown, NJ  07960
     *Counsel for Appellant Metropolitan Marine Maintenance Contractors Association*

Phoebe S. Sorial, Esq. [Argued]
Waterfront Commission of New York Harbor
39 Broadway, 4th Floor
New York, NY  10006
     *Counsel for Appellee Waterfront Commission of New York Harbor*

_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

The District Court ruled that the Appellee, Waterfront Commission of New York Harbor (Commission or Waterfront Commission),[1] was within its statutory authority

_____

[1] Appellee Waterfront Commission of New York Harbor is a bi-state corporate and political entity created by interstate compact.  N.J.S.A. § 32:23-1; N.Y. Unconsol. Laws § 9801 (McKinney).  All statutory citations to the Compact

to require shipping companies and other employers to certify that prospective employees had been referred for employment pursuant to federal and state nondiscrimination policies. The District Court also rejected claims that the Commission had unlawfully interfered with collective bargaining rights, holding that such rights were not completely protected under the language of the Waterfront Commission Compact (Compact), which was entered into by the states of New Jersey and New York in 1953. We will affirm.

I.

*Factual and Procedural Background*

This appeal takes us deep into the hiring practices and procedures utilized on the New York/New Jersey waterfront. We will start with some history, which to varying degrees, has been reported elsewhere. *See, e.g.*, *De Veau v. Braisted*, 363 U.S. 144 (1960); *Waterfront Comm'n of N.Y. Harbor v. Sea Land Serv., Inc.*, 764 F.2d 961 (3d Cir. 1985); *Hazleton v. Murray*, 21 N.J. 115 (1956); *Waterfront Comm'n of N.Y. Harbor v. Constr. & Marine Equip. Co., Inc.*, 928 F. Supp. 1388 (D.N.J. 1996). Years of criminal activity and corrupt hiring practices on the waterfront were first brought to light in 1949 in a series of 24 articles published in the *New York Sun* by journalist Malcolm Johnson. Entitled "Crime on the Waterfront," these articles won Johnson the Pulitzer Prize, and formed the basis for the 1954 film "On the Waterfront."[2]

---

provisions will be to the New Jersey statute, unless otherwise noted.

[2] For detailed historical information on the New York waterfront and its association with criminal activity, see

Hiring practices on the waterfront also caught the attention of the New York State Crime Commission (Crime Commission), which issued a report in 1953 relating in detail the pervasive influence of crime and corruption on waterfront hiring practices. *See Fourth Report of the New York State Crime Commission*, N.Y.S. Leg. Doc. No. 70 (1953). The Crime Commission singled-out the "shape-up" hiring system for particular scorn. The term connotes a hiring method whereby the applicants appeared daily at the docks or other locations and a hiring boss would select those who would be given work. *Id.* at 37.[3] The foundation of this practice was the union foreman's unfettered control over the process and his unchecked power to select whomever he desired for employment.

The Crime Commission report led to public hearings on its findings. Then-New York Governor Thomas E. Dewey held hearings, the goal of which was to come up with a legislative plan to address the Commission's concerns. Representatives of the State of New Jersey were also present for and participated in these hearings. The "shape-up" hiring system was identified by the Commission as a vector for corruption and criminal practices on the docks. So as "to investigate, deter, combat and remedy" this criminality and corruption, the states of New Jersey and New York entered into the Compact in 1953. *Gonzalez v. Waterfront Comm'n*

---

Nathan Ward, Dark Harbor: The War for the New York Waterfront (2010); *see also* Jonathan Eig, *'Waterfront' Jungle,* N. Y. Times, Sept. 24, 2010.

[3] *See also Levias v. Pac. Maritime Ass'n*, 760 F. Supp. 2d 1036, 1050 (W.D. Wash. 2001).

*of N.Y. Harbor*, 755 F.3d 176, 177 (3d Cir. 2014); *see also* N.J.S.A. § 32:23-1, et seq. Pursuant to Art. I., § 10 of the United States Constitution, Congress approved the Compact in August of 1953.[4] The Compact created the Waterfront Commission to, among other things, eliminate corrupt hiring practices on the waterfront. *Waterfront Comm'n of N.Y. v. Elizabeth-Newark Shipping Inc*., 164 F.3d 177, 180 (3d Cir. 1980) (citing *Hazelton*, 21 N.J. at 120-23). In enacting the Compact, the legislatures of both states noted:

> that the conditions under which waterfront labor is employed with the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systemic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices, and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral

---

[4] The Compact Clause of the Constitution provides that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State." Art. I, § 10, cl. 3. Accordingly, before a compact between two States can be given effect it must be approved by Congress. *See Virginia v. Maryland*, 540 U.S. 56, 66 (2003). Once a Compact receives such approval, it is "transform[ed] . . . into a law of the United States." *Id*. (internal quotation marks omitted).

9

character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment.

N.J.S.A. § 32:23-2.

One way the Compact sought to rein in the corruption associated with hiring on the waterfront was by requiring the Commission to regulate longshoremen and stevedores. Employment Information Centers were to be operated by the Commission to handle all hiring of longshoremen. Further, the Compact charged the Commission with registering all individuals who were qualified to work as longshoremen and specifically provided that "no person shall act as a longshoreman within the Port of New York district unless at the time he is included in the longshoremen's register." N.J.S.A. § 32:23-27. The Compact also provided a definition of a longshoreman:

[A] natural person, other than the hiring agent, who is employed for work at a pier or other waterfront

10

terminal, either by a carrier of freight by water or by a stevedore (a) physically to move waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, or (b) to engage in direct and immediate checking of any such freight or of the custodial accounting therefore, or in the recording or tabulation of the hours worked at piers or other waterfront terminals by natural persons employed by carriers of freight by water or stevedores, or (c) to supervise directly and immediately others who are employed as in subdivision (a) of this definition.

N.J.S.A. § 32:23-6. This definition was expanded in 1957 to include workers who performed labor that was incidental to the movement of waterborne freight. N.J.S.A. § 32:23-85(6). A longshoreman who fits either the original or expanded definition was known as a "deep sea" longshoreman.[5] Further, the Compact gave the Commission the authority to license stevedoring companies that wanted to operate at the Port. A 'stevedore,' according to the Compact, is a contractor

---

[5] These longshoremen are sometimes referred to as "five-digit" longshoremen in light of the five digit registration number assigned them by the Commission. *See Bozzi v. Waterfront Comm'n of N. Y. Harbor*, No. 90-cv-0926 (MGC), 1994 WL 606043 at *2 (S.D.N.Y. Nov. 3, 1994).

hired by a carrier of waterborne freight to move freight in ships that are berthed at piers, or at other waterfront terminals. *See* N.J.S.A. § 32:23-6.

By 1969, new developments in shipping technology required changes to hiring procedures on the waterfront. The New Jersey Supreme Court has summarized this new technology:

> Containerization involves the loading of cargo by a shipper into a box-like object called a container. The cargo-laden container is loaded onto a truck frame that transports it to a pier where it is hoisted aboard a ship designed to carry containers. At the port of discharge, the process is simply reversed. Containerization contrasts sharply with the traditional "break-bulk" shipping method, which involved loading trucks item by item, emptying them piece by piece at the pier, and then loading the ship in the same fashion.

*Waterfront Comm'n of N.Y. v. Mercedes-Benz of N. Am., Inc.*, 99 N.J. 402, 411-12 (1985). Containerization and other new technologies dramatically decreased the need for manual labor at the port. This decrease in the size of the labor force led, in turn, to the enactment of an amendment to the Compact: Section 5-p. Known as the "closed register

statute," Section 5-p authorized the Commission to open or close the Longshoreman's Register so as to balance the workforce with the demand for labor. *See, e.g.*, *Nat'l Org. of Women, N.Y. Chapter v. Waterfront Comm'n of N.Y. Harbor*, 468 F. Supp. 317, 319 (S.D.N.Y. 1979); *see also* N.J.S.A. § 32:23-114. The prevalence of containerization in the shipping industry also led to the creation of a new class of dock worker: longshoremen who did not load or unload ships, but instead performed services that were incidental to those tasks. This new class of longshoremen were registered with the Commission and commonly referred to as "A-registrants," to distinguish them from deep sea longshoremen.[6] A-registrants were not permitted to do any work that involved the discharge or unloading of cargo vessels. New classifications of stevedores were also created to cover those contactors that were involved in the loading and unloading of the containers, cargo storage, cargo repairing, coopering, general maintenance and other miscellaneous work.

The Commission codified these worker classifications in Section 4.4 of its Rules and Regulations. Section 4.4 divided the Longshoreman's Register into two sections, reflecting these two classifications of labor:

> (b) The register shall be divided as follows: (1) A "deep sea" register which shall include all persons registered by the

---

[6] The "A" classification comes from the "A" prefix attached before these worker's multi-digit registration number, which appear on licenses issued by the Commission to those workers. *See Bozzi*, 1994 WL 606043 at *3.

13

> commission as longshoremen and checkers except those persons registered as longshoremen pursuant to the 1969 amendments to the Act (NY Laws 1969, ch. 953; NJ Laws 1969, ch. 128); (2) An "A" or "1969 amendment" register which shall include all persons registered by the commission as longshoremen pursuant to the 1969 amendments to the act (NY Laws 1969, ch. 953; NJ Laws 1969, ch. 128).

N.Y. Comp. Codes R. & Regs. Tit. 21 § 4.4 (2013). This resulted in the bifurcation of the labor force: members of the New York Shipping Association (NYSA) represented the deep sea registrants while Metropolitan Marine Maintenance Contractor's Association (MMMCA) members employed the A-registrants. In the 1980s, the Commission clarified the status of these two workforces as they related to the closed register. Section 5-p was amended to now provide that "[n]otwithstanding any other provision of this act, the commission may include [A-registrants] in the longshoremen's register under such terms and conditions as the commission may prescribe." N.J.S.A. § 32:23-114(4).

Section 5-p was again amended in 1999. Increased business in the port and attrition in the labor force, among other things, necessitated changes to the procedures that had previously been used to open the longshoreman's register. Public hearings were held in which the Commission and

14

several of the Appellants participated. As amended, Section 5-p required that

> [t]he sponsoring employer shall certify that the selection of the persons so sponsored was made on a fair and non-discriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities.

N.J.S.A. § 32:23-114(1).

The dispute before us today arose from the Commission's decision to open the longshoremen's register in December of 2013. The NYSA, an organization representing marine terminal operators, stevedoring companies and ship operators in the Port of New York and New Jersey, along with the MMMCA, and the International Longshoremen's Association, AFL-CIO (ILA), filed a complaint against the Commission in November of 2013.[7] The NYSA and the ILA had, three months earlier, asked the

---

[7] The MMMCA represents maintenance contractor employers and the ILA represents longshoremen and other waterfront workers employed by the NYSA's members. Also parties to this dispute are two local chapters of the ILA—Local 1804-1 and Local 1814. Where appropriate, we will refer to all Appellants collectively.

15

Commission to add, on its own initiative, more than 600 employees to the deep sea register. The NYSA and the ILA also told the Commission that they would recruit, train, and hire individuals pursuant to the terms of the Recruitment and Hiring Plan, which was agreed to under a new collective bargaining agreement between the NYSA and the ILA.[8] After meeting with representatives of the NYSA, MMMCA and others, the Commission issued Determination 35 in December of 2013 which, among other things, stated that the Commission would open the Register to accept applications for 225 new positions. The Commission's Determination also required:

> . . . that prior to the Commission's acceptance of any application for inclusion in the Longshoremen's Register pursuant to this Determination, a representative of the NYSA–ILA Contract Board directly involved with the administration of the Hiring Plan shall submit a letter setting forth the name and address of the recommended individual, and certifying that:
>
>> (1) he or she has personal knowledge of the facts concerning the recruitment,

---

[8] Under this plan, 51% of new hires were to consist of honorably discharged military veterans, 25% of new hires would be referrals from the ILA and 24% would be referrals from the NYSA.

referral, selection and sponsorship of [the applicant] and (2) the selection of the person so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities.

Commission Determination 35 (Dec. 3, 2013).[9]

The Appellants sued the Commission in November of 2014. They asked for declaratory and injunctive relief pursuant to the Declaratory Judgments Act, 28 U.S.C.A. §§ 2201-2202 (2006). They also asked the District Court for a preliminary injunction prohibiting the Commission from implementing its antidiscrimination certification requirements. The District Court denied the request for a preliminary injunction, finding that the Appellants failed to show irreparable harm and a likelihood of success on the merits. The Commission then filed a motion to dismiss. Appellants amended their complaint in January of 2015, which the District Court ultimately dismissed. Appellants have timely appealed that dismissal.

---

[9] A copy of Determination 35 is available at http://www.waterfrontcommission.org/news/determination35.pdf

17

III.

We have jurisdiction to review the District Court's October 9, 2014 order dismissing the Appellants' amended complaint under 28 U.S.C. § 1291.  We exercise plenary review of an order granting a motion to dismiss under Rule 12(b)(6) and apply the same standard as the District Court. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

IV.

Appellants NYSA, ILA and the ILA Locals filed a joint brief while Appellant MMMCA opted to brief us separately.  Appellants collectively question the validity of the antidiscrimination certification procedure added to Section 5-p in 1999, and, by extension, Rule 4.4.  They also claim that they have successfully pleaded the Commission's unlawful interference with their collective bargaining rights. The NYSA, ILA and ILA Locals further claim that the Commission violated their due process rights in promulgating its certification amendment in Rule 4.4.  For organizational purposes, we will address these issues with reference to the specific counts of the Amended Complaint in which they were raised.

A.

*Dismissal of Counts I and II*

The Compact permits "amendments and supplements" as long as those changes implement the Compact's purposes and are concurred in by the legislatures of New Jersey and New York. N.J.S.A. § 32:23-70; N.Y. Unconsol. § 9870. Such amendments have the pre-approval of Congress.[10] Here, Count I of the Amended Complaint challenges the Commission's amendment to Rule 4.4 on the basis that the Compact provision under which it was promulgated— the1999 amendment to Compact Section 5-p—is not consistent with the purposes of the Compact, and is therefore invalid due to a lack of Congressional approval. Therefore, to resolve this issue, we must determine whether the anti-discrimination certification requirement of Section 5-p is a valid amendment which implements the purposes of the Compact. The parties agree that the resolution of this issue turns on whether one of the purposes of the Compact was the elimination of racial discrimination in the hiring of longshoremen. Meanwhile, Count II of the Amended

---

[10] Congress' pre-approval of such amendments is certainly rare. As the Supreme Court has noted: "Congress expressly gave its consent to such implementing legislation not formally part of the compact. This provision in the consent by Congress to a compact is so extraordinary as to be unique in the history of compacts. Of all the instances of congressional approval of state compacts . . . we have found no other in which Congress gave its consent to implementing legislation. It is instructive that this unique provision has occurred in connection with approval of a compact dealing with the prevention of crime where, because of the peculiarly local nature of the problem, the inference is strongest that local policies are not to be thwarted." *De Veau v. Braisted,* 363 U.S. 144, 154 (1960).

Complaint turns on the scope of the 1999 amendment to Section 5-p itself; that is, whether that amendment applies to A-registrants. The resolution of these questions requires us to interpret provisions of the Compact. To so do, we treat the Compact like any other federal statute, and interpret it accordingly. *See Texas v. New Mexico*, 482 U.S. 124, 128 (1987).

Appellants argue that because the Compact did not specifically mention racial discrimination at the time it was enacted, any amendment designed to ensure fair and non-discriminatory hiring practices cannot further the Compact's purposes and is, therefore, unconstitutional. They base this argument on their belief that the phrase "corrupt hiring practices" (which they admit the Commission was formed to combat) does not include the purposeful exclusion of racial minorities. Therefore, the Appellants conclude, the Commission cannot require them to certify that their hiring practices comply with federal and state laws dealing with equal opportunity. This argument is meritless. Like the District Court, we also conclude that Count I of the Amended Complaint fails to state a claim as matter of law because one of the purposes of the Compact is the elimination of racial discrimination in hiring. Section 5-p's certification requirement furthers this purpose and is thus, constitutional.

The stated purpose of the Compact, as set out in Article I, is to rid the docks of "corrupt hiring practices," "depressing and degrading" labor conditions, and "irregularity of employment." N.J.S.A. § 32:23-2; *see also Elizabeth-Newark Shipping, Inc.*, 164 F.3d at 180 ("The Compact was enacted to eliminate corrupt hiring practices on

20

the . . . waterfront.").[11]  Can it seriously be argued that racial discrimination in hiring (or anywhere, for that matter), is not a corrupt practice?  We questioned counsel for the NYSA at oral argument on this very point and counsel conceded that the antidiscrimination certification requirement was "a good thing."  Oral Argument Tr. at 8-9.  When pressed further, and mirroring the arguments raised in their brief, counsel maintained that racial discrimination may be a corrupt hiring practice, but that it was not one of the practices considered corrupt when the Compact was enacted in 1953.  This argument belies the Compact's legislative history and we

---

[11] Appellant MMMCA argues that Article I of the Compact is "the least likely place to find the 'purposes' of the Compact," and that "Congress did not treat 'the purposes of the Compact' as a coded reference to Article I."  MMMCA Br. at 37, 48.  Instead, the MMMCA maintains that Article I is merely a preamble or introduction for the "substantive provisions of the Compact."  MMMCA Br. at 47-48.  As the Commission points out, however, this argument quickly withers when confronted with testimony offered when the Compact was discussed in the United States Senate in July of 1953.  Speaking about the Compact, New Jersey Senator Robert C. Hendrickson, who had introduced a bill granting the consent of Congress to the Compact, stated that "the purpose of this bill can be best stated by referring to article I of the compact, which sets forth the findings which shook and rocked the American people on the occasion of their recent public disclosure."  WC-ADD at 448.  In support of their arguments on appeal, the Appellee submitted an addendum containing Commission reports and extensive legislative history materials.  We refer to that addendum hereinafter as "WC-ADD."

have little difficulty concluding that such a corrupt practice was indeed contemplated by the state legislatures and Congress in enacting and approving the Compact.

Racial discrimination in hiring was a concern brought to the attention of the state legislatures in 1953. Testimony provided by Cleophus Jacobs, the secretary-treasurer of ILA Local 968, a predominately African-American local, revealed that of its 500 members, only 100 had been getting work at that time. Jacobs specifically pointed to the shape-up system as an instrument of racial discrimination:

> Our opposition to the shape-up, therefore, is not of recent origin, nor are we jumping on the bandwagon of an outraged public opinion. To the members of our local the shape-up had produced an even greater evil than that which the public generally has now come to recognize. It has been the instrument of racial discrimination against our members and consequently has further reduced job opportunities for them.

WC-ADD at 301. This testimony was not the only instance where racial discrimination was discussed prior to the enactment of the Compact. Special Counsel to the Dewey hearings, Theodore Kiendl, followed-up on Jacob's statements by asking him:

22

> Q: And you think [the shape-up] system leads to racial discrimination?
>
> A: It does. Whether crime might have been produced or not, but the system of shape-up really facilitates the exercise of racial discrimination.

WC-ADD at 305. Counsel also produced a March 1952 edition of the "Negro Longshoreman," a newsletter written and edited by the rank-and-file membership of Local 968. Counsel called attention to the following statement: "We Negro longshoremen are discriminated against first of all by our own International officials of the ILA who deny us representation or jurisdiction over any piers on the waterfront." *Id.* at 306. Finally, the record of the state hearings clearly demonstrates that racial discrimination was one of the corrupt hiring practices the Compact strove to eliminate. Counsel directly asked Jacobs:

> Q: Now, don't you think that the programs presented by the State Crime Commission eliminate the shape-up entirely and substituting a new form of hiring is highly desirable to obtain the very ends that your union wants to accomplish, to wit, the elimination of racial discrimination entirely?

23

A.    I agree the Commission
has made an effort . . .

*Id.*

The subsequent federal Congressional hearings on the Compact likewise contain discussions about the problem of racial discrimination in waterfront hiring practices.  During a 1953 hearing on the Compact before the United States Senate, New Hampshire Senator Charles W. Tobey scathingly criticized ILA hiring practices of the time as racially discriminatory.  Senator Tobey first noted the ILA's practice of charging African-American union members double the amount of initiation fees they charged to white members.  WC-ADD at 445.  Then, the Senator continued his statements decrying the racial discrimination inflicted upon the ILA's African-American members:

> Man's inhumanity to man is being exemplified in certain labor circles.  Such labor unions had better take cover.  They are riding for a fall.  The time cannot come too soon.  Let us clean them out. Who is running this country anyway, I ask—honest, God-fearing people, or crooked labor union leaders?  We can give names and addresses.  Cry out, America, "Unclean, unclean."

*Id*.  The "corrupt hiring practices" language used in the Compact embodies the concerns both the state and federal

legislatures had in confronting racial discrimination in hiring on the docks. Given this legislative history, we easily conclude that the 1999 Amendment to Section 5-p reflected the legislatures' belief that ending racial discrimination in employment was part of the Compact's core purposes. As such, it had Congressional approval. We, therefore, agree with the District Court that Count I fails to state a claim.[12]

We also will affirm the District Court's dismissal of Count II. As we indicated earlier, the issues raised in this Count invoke the scope of Rule 4.4, that is, to which workers it applies. Under the framework in place for hiring of A-registrants, the ILA has the exclusive right to recruit and select potential employees to be referred for employment as A-registrants. The Commission maintains that this practice is no better than the shape-up system of old. In amending Rule 4.4, the Commission's purpose was to hold employers accountable for any racial discrimination that may have infected the ILA's selection and referral of A-registrants. Put another way, the amendment was an attempt by the Commission to ensure that the NYSA and the MMMCA's hiring of A-registrants was done in a nondiscriminatory manner.

Appellants argue that the Rule's certification requirement is improper because Section 5-p, on which it was

---

[12] The NYSA and the ILA argue, in a brief footnote, that the District Court's dismissal of Count V should be reversed for the same reasons as Count I. NYSA-ILA Br. at 45 n.10. They point to no other grounds for reversal of this Count. Inasmuch as we will affirm the dismissal of Count I, we likewise will affirm the dismissal of Count V.

25

based, only applies to deep-sea longshoremen, not A-registrants. Appellant MMMCA goes further, arguing that the Commission has repeatedly stated that the Section 5-p does not apply to maintenance and repair workers, an overwhelming majority of whom are A-registrants. A look at the language of Section 5-p itself quickly defeats this argument. Section 5-p of the Compact contains five subdivisions, the fourth of which states that "[n]otwithstanding any other provision of this act, the commission may include in the longshoremen's register under such terms and conditions as the commission may prescribe: . . . [a] person defined as a 'longshoreman' in subdivision (6) of section 1(5-a) of P.L.1954, c. 14 (C.32:23-85), who is employed by a stevedore as defined in paragraph (b) or (c) of subdivision (1) of the same section (C.32:23-85) and whose employment is not subject to the guaranteed annual income provisions of any collective bargaining agreement relating to longshoremen." N.J.S.A. § 32:23-114(4). These persons, in other words, are A-registrants and under the Compact, the Commission may include them in the register under whatever terms and conditions it wishes.

Appellants offer us little contrary argument, pointing only to an unreported ruling of the United States District Court for the Southern District of New York as support for their position. In *Bozzi, supra.,* two A-registrant workers had mistakenly been working as deep-sea longshoremen in the holds of general cargo vessels. The Commission, after learning of this error, told the two workers to cease performing general longshore work, except for those jobs they had been approved to perform. The A-registrants sued, asking for a declaratory judgment that the Commission had the authority under Section 5-p(5)(b) of the Compact to

26

include them in the closed deep-sea register. The Commission argued that the closed register provision has always been interpreted to apply only to deep-sea longshoreman and the Commission has consistently viewed Section 5-p(5)(b) as a housekeeping provision, which merely clarifies the status of A-registrants. The District Court, after an extensive discussion of Section 5-p(5)(b)'s legislative history, agreed with the Commission, and held that the two A-registrants could not individually be added to the closed deep-sea register. The individual workers asked for a declaratory judgment that the Commission had the authority to include them in the closed deep-sea register.

The Appellants seize upon the Commission's position in *Bozzi*—that the closed register provisions of Section 5-p only apply to deep-sea longshoremen, not A-registrants—to argue that the nondiscrimination certification requirements of Section 5-p only apply to deep-sea longshoremen. This contention is baseless and misconstrues *Bozzi*. While A-registrants may not be included in the closed register provisions of Section 5-p, they are subject to Section 5-p's other provisions, like the nondiscrimination provisions at issue here. As the District Court noted, the Commission has been interpreting Section 5-p(5)(b) this way for decades, and that interpretation is entitled to great weight. *See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc*., 467 U.S. 837, 844 (1984).

In sum, Compact Section 5p-(5)(b) clearly provides that A-registrants may be included in the deep-sea register under "such terms and conditions as the [C]ommission may prescribe." N.J.S.A. § 32:23-114(4). The District Court did

not err in dismissing Count II of the Amended Complaint for failure to state a claim.

B.

*Dismissal of Counts III, IV and VII*

We will also affirm the District Court's dismissal of Counts III, IV, and VII of the Amended Complaint. Taken together, these three counts accuse the Commission of unlawfully interfering with the Appellants' collective bargaining rights by implementing the nondiscrimination certification provisions. The Appellants also maintain that the Commission's actions violate national labor policy by dictating the terms of their collective bargaining agreements. We reject both contentions.

We take these claims out of numerical order, and start our discussion with Count VII. The District Court dismissed Count VII for an inadequacy in pleading under Fed. R. Civ. P. 8(a), and we review such a ruling for an abuse of discretion. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702 (3d Cir. 1996). We see no abuse of the District Court's discretion in its dismissal of this count. At the outset, the NYSA and ILA acknowledge this count's lack of a specific demand for relief. NYSA-ILA Br. at 61. This omission, in and of itself, justifies a dismissal of the count. *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995). Further, we share the District Court's conclusion that Count VII is little more than a collection of conclusory statements and a recitation of Commission Determination 35. Given this, the District Court's conclusion that the Appellants failed to connect their allegations to a violation of Compact Article XV was not unreasonable and

28

therefore, its decision to dismiss this count for a failure to adequately allege facts sufficient to state a claim for relief was not an abuse of its discretion.

Turning now to Counts III and IV, we note that the Appellants argue, with more specificity, that the Commission's actions violate Article XV of the Compact, which states, among other things, that:

> This compact [was] not designed . . . to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way individually, collectively, and though labor organizations or other representatives of their own choosing.

> ****

> This compact is not designed and shall not be construed to limit in any way rights of longshoremen, hiring agents, pier superintendents or port watchmen or their employers to bargain collectively . . ..

N.J.S.A. § 32:23-68, -69. Appellants argue that this Article guarantees them "unfettered collective bargaining" and gives

them "freedom of choice in the selection of employees." NYSA-ILA Br. at 9-10. This position is untenable, however, because the language of Article XV is not absolute. Indeed, in this very context, we have held that collective bargaining rights cannot supersede "the Commission's supervisory role regarding practices that might lead to corruption." *Sea Land,* 764 F.2d at 966-67. That is, Article XV "guarantees that [collectively bargained] hiring procedures will not be displaced where they comport with the Compact." *Id*. at 963. Obviously, the converse is true as well: where actions are not in furtherance of the original purposes of the Compact, collective bargaining rights may be infringed upon.

Here, as we previously determined, the eradication of racial discrimination in hiring was one of the original purposes of the Compact. The Commission's actions in requiring certification that prospective employees were selected in a nondiscriminatory manner certainly further the Compact's purposes of rooting out corrupt hiring practices such as racial discrimination. Therefore, the Commission's certification regulation cannot be viewed as an improper intrusion into Appellants' collective bargaining rights.

Appellant MMMCA takes a slightly different tact on this issue, arguing that the Commission cannot undertake any action that would limit the ability of labor and management to agree to a mutually satisfactory way of selecting employees. The MMMCA maintains that "the Compact treats as inviolable whatever method the bargaining parties arrive at." MMMCA Br. at 56. While the Compact does safeguard the Appellants' collective bargaining rights, it does so only to the extent those rights do not conflict with the purposes of the Compact. We held as much in *Sea Land, supra*. There, in

order to resolve a conflict between a Commission regulation and an existing CBA, we proposed a modification, noting that this change "maintains both the Commission's supervisory role regarding practices that might lead to corruption and the union's collectively-bargained hiring procedures." 764 F.2d at 966-67. We reject, therefore, the argument that Appellants' collective bargaining rights are absolute and will affirm the District Court's dismissal of these counts.

## C.

### *Due Process Issues*

Appellants' last issue will not detain us long. The Appellants contend that their due process rights were violated because the Commission did not conduct public hearings before implementing the nondiscrimination amendment. This argument does not hold up under scrutiny because the Commission's actions were legislative and procedural due process does not extend to legislative action. *See Rogin v. Bensalem Twp.*, 616 F.2d 680, 693 (3d Cir. 1980) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization of Colo.*, 239 U.S. 441 (1915); *see also Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994) (en banc)).

First, and contrary to their own argument, the Appellants note that the Amended Complaint alleged that the nondiscrimination amendment was "enacted," which connotes legislative action. Second, the Amended Complaint fails to allege that the Commission acted in some way that was contrary to statutory procedures. Indeed, amending the Commission's own rules is legislative action.

31

More importantly, the Commission gave the NYSA-ILA ample notice and opportunity vis-à-vis the nondiscrimination amendment. The Appellants were notified of the proposed amendments and indeed, submitted comments in opposition during the pertinent time period. We see no procedural due process violation here simply because the Commission did not hold a public hearing before amending its own rules. Neither did the District Court and we will affirm that determination.

## V.

Like the District Court, we conclude that the Amended Complaint fails to state any claim upon which relief may be granted. Therefore, we see no error in the District Court's dismissal.